833 So.2d 885 (2002)
STATE of Louisiana
v.
Chad Roy LOUVIERE.
No. 2000-KA-2085.
Supreme Court of Louisiana.
September 4, 2002.
Rehearing Denied January 24, 2003.
*889 Phyllis E. Mann, Alexandria, Counsel for Applicant.
Richard P. Ieyoub, Attorney General, Joseph L. Waitz, Jr., District Attorney, Ellen M. Daigle, Baton Rouge, Mark D. Rhodes, Houma, Counsel for Respondent.
KNOLL, Justice.
This direct criminal appeal concerns the defendant's conviction for first-degree murder and sentence of death. On October 23, 1996, a Terrebonne Parish grand jury indicted Chad Roy Louviere for the first-degree murder of Pamela Duplantis. Pursuant to La.C.Cr.P. art. 557, the defendant subsequently pleaded guilty. Following a sentencing hearing before a jury to determine whether the defendant should receive the death penalty or life imprisonment without benefit of parole, probation, or suspension of sentence, the jury unanimously returned a sentence of death. Specifically, the jury found the following aggravating circumstances: (1) the offender was engaged in the perpetration of an aggravated kidnapping, second degree kidnapping, and aggravated rape; and (2) the offender was previously convicted of an unrelated aggravated kidnapping and aggravated rape; and (3) the offender knowingly created a risk of death or great bodily harm to more than one person. La. C.Cr.P. art. 905.4(A)(1),(3),(4).
On direct appeal to this court under La. Const. Art. V, § 5(D), the defendant appeals his conviction and sentence. For the reasons set forth below, we affirm the defendant's conviction for first-degree murder and the death sentence.

FACTUAL AND PROCEDURAL BACKGROUND
The facts of this case are essentially undisputed, and by necessity, their narration *890 requires describing the instant offense as well as other offenses committed on the same morning, but before the murder, and other offenses committed after the defendant's incarceration. At approximately 8:30 a.m. on October 17, 1996, the defendant, a Terrebonne Parish Sheriff's deputy driving alone in his marked patrol car, pulled over a vehicle on Bull Run Road in Houma. After directing the driver, D.D.,[1] to provide her vehicle's registration, the defendant sprayed her in the face with mace, handcuffed her, and dragged her into his patrol car. The defendant drove D.D. to a cane field, where he removed D.D.'s clothing, photographed her, vaginally penetrated her, forced her to perform oral sex, and anally penetrated her. The defendant then returned D.D. to her vehicle, released her, and drove away.
After D.D. overcame her fear of defendant's death threats, she reported this incident to the Terrebonne Parish Sheriff's Office, which issued a police radio alert to be on the lookout for defendant. The sheriff's office issued the alert after defendant had responded to radio calls, but refused to disclose his location or return to the police station.
Later that morning, defendant drove to the Argent Bank, where his estranged wife, A.L., was working. Still in his full deputy's uniform, defendant carried a duffle bag laden with weapons, including an AR-15 rifle, as he entered the bank. Inside, the defendant drew and cocked his sidearm and directed J.B., the bank's manager, to remove the bank's two male customers, and lock the entrance, leaving only the bank's six female employees inside the bank. The defendant then ordered the women to leave their work stations and assemble in the lobby.
The defendant then demanded that J.B. retrieve the surveillance tape from the bank's video recorder. J.B. returned to the lobby with the tape, and defendant then fired several shots from his AR-15 rifle into the tape, destroying it as it lay on the lobby's tile floor.
Meanwhile, Pamela Duplantis was seated in the lobby, but somewhat apart from the other women who were huddled together. She was crying. After conversing with his estranged wife, A.L., the defendant again shouldered his rifle. Standing some ten feet away, the defendant aimed at Pamela Duplantis and fired, striking her near the center of her forehead. She died instantly.
Thereafter, defendant ordered the employees to barricade the entrances and windows with furniture. The defendant handcuffed several of the women together, removing the restraints at times to have an employee with him as he walked through the bank, checking to insure that the law enforcement officers who had assembled outside had not infiltrated the building and observing the activity in their perimeter around the bank.
In exchange for lunch, the defendant uncuffed and released one employee to the police. In exchange for a radio, the defendant then released another employee.
During the approximately 30-hour standoff with police, defendant ordered J.B. and A.L. to undress and perform oral sex on each other. The defendant also directed J.B. and A.L. to insert a wooden martial arts weapon, a kubaton, into each other's vagina. The defendant raped J.B. on two separate occasions, vaginally and *891 anally, and ordered her to perform oral sex upon him.
After pulling another employee, B.T., through the bank for a perimeter check, defendant brought B.T. into a storage room where he ordered her to perform oral sex upon him. The defendant unsuccessfully attempted to penetrate B.T. vaginally. The defendant later brought A.L. into the storage room, where he likewise ordered her to perform oral sex.
On October 17, 1996, pursuant to police negotiations, the defendant released B.T. around 8 p.m. and also placed the rifle outside the bank, retaining two handguns. The next day, on October 18, 1996, around noon, after further negotiations, J.B. carried the remainder of the weapons outside the bank, then returned inside. The defendant then released both A.L. and J.B., and surrendered.
Following the Terrebonne Parish grand jury's indictment of first-degree murder, the defendant pleaded not guilty. Venue was transferred to Lafayette Parish pursuant to defendant's motion for a change of venue. While awaiting trial in the Lafayette Parish jail, defendant, armed with a sharpened toothbrush "shank," overpowered a female deputy. Pressing the weapon to her neck and threatening to kill her, defendant held the deputy hostage until he was allowed to see a female inmate, J.R. The jail and J.R. complied with defendant's demand, whereupon defendant released the deputy, whose neck was gouged by the shank. J.R. remained with the defendant for several hours in the jail's control room. Upon her release, J.R. stated that she and defendant had consensual sex in the control room. Later, J.R. testified that the sex was not consensual, and that her earlier statement was made out of fear of retaliation.
After the hostage offenses in the Lafayette jail and the attending publicity, the state moved that venue again be transferred. The trial court granted the motion, and the case was set for trial in Terrebonne Parish with jurors selected from East Baton Rouge Parish.
Thereafter, on December 22, 1998, by joint stipulation with the state and with consent of the trial court, the defendant changed his original plea and entered a plea of guilty to the charge of first-degree murder. The trial court then conducted the capital sentencing hearing. Following four days of testimony, which included 19 defense witnesses, the jury returned a recommendation of death after finding all the aggravating circumstances advanced by the state. On February 24, 2000, the trial court formally sentenced defendant to death by lethal injection.

DISCUSSION
The defendant filed twenty-five assignments of error. Of these, four merit discussion in the published opinion and are addressed under headings designating the primary procedural stage implicated; the others are discussed in an unpublished appendix.[2]

Pre-Trial
Constitutionality of Guilty Plea in Capital Cases (Assignment I)
In his first assignment of error, the defendant argues that despite the specific statutory provision in La.C.Cr.P. art. 557[3] *892 which allows a guilty plea in a capital case, La. Const. Art. I, § 17[4] prohibits allowing a defendant from pleading guilty and then proceeding to a trial on the issue of punishment alone. In support of his contention, defendant points to language in this court's opinion in State v. Brogdon, 426 So.2d 158 (La.1983). In Brogdon, when the defendant argued that the trial court erred in refusing to accept his guilty plea, we stated: "[A] defendant in a capital case may not waive his right to a trial by jury. La. Const. art. I, sec. 17. The trial judge is free to reject a defendant's unilateral offer to plead guilty [made] in order to deprive the state of the right to seek the death penalty in an appropriate case." Brogdon, 426 So.2d at 165.
While we noted in Brogdon that the interests of justice require that no mere procedural device such as a plea should deprive the state from pursuing the full range of penalties for murder, including capital punishment, our holding rested on the defendant's right to a jury trial. Our statement in Brogdon that referenced the state's interests in capital procedure, while dicta, was not improvidently made. Indeed, as we will explain further below, we note that the current statutory framework properly balances both interests that we recognized in Brogdonthe defendant's right to a jury trial and the state's interest in seeking the death penalty when appropriate.
At the time we decided Brogdon, there was no statutory mechanism for a defendant to plead guilty while still preserving the defendant's right to a jury trial on the penalty issue. Without the statutory mechanism, there would have been no authority for the trial court to convene a jury and try the penalty issue. See La. Const. Art. I, § 2: "Except as otherwise provided by this constitution, no one of these branches, nor any person holding office in one of them, shall exercise power belonging to either of the others." Enacting procedures for punishment is a legislative function. See, e.g., State v. Jones, 94-0459, p. 16 (La.7/5/94) 639 So.2d 1144, 1155 (recognizing the "legislature's latitude to pass capital sentencing guidelines."). In short, because there was no provision to enter a plea and decide the guilt issue alone, our holding in Brogdon was based on a statutory framework by which any guilty plea would have the effect of depriving the defendant of the right to a jury trial.
Aside from the distinction between Brogdon and the instant case in which the trial court accepted the plea pursuant to La.C.Cr.P. art. 557 as amended, defendant errs in reading La. Const. Art. I, § 17 in isolation. The right to trial for a capital defendant, as well as other criminal defendants, does not derive from Art. I, § 17, but from Art. I, § 16: "Every person *893 charged with a crime ... is entitled to a speedy, public, and impartial trial ...." (Emphasis added). Accordingly, the rights enumerated in Art. I, § 17 are based upon antecedent rights, including the right to a trial, enumerated in Art. I, § 16. Any valid textual interpretation of Art. I, § 17 must therefore account for those antecedent rights.
Bearing in mind then that the right to a trial derives from Art. I, § 16, gives clarity to the requirement in Art. I, § 17 that a "criminal case in which the punishment may be capital shall be tried before a jury...." (Emphasis added). In ascertaining the meaning of this statement, two additional principles must be born in mind. First, that the provisions of the Louisiana Constitution are not grants of power, but instead are limitations on the otherwise plenary power of the people of the State exercised through the legislature. Aguillard v. Treen, 440 So.2d 704, 707 (La.1983). Secondly, and as a result, the legislature may enact any laws that the federal or state constitutions do not prohibit. See id.; see also Polk v. Edwards, 626 So.2d 1128 (La.1993)("Alternatively stated, the provisions of the Louisiana Constitution serve as limitations on the otherwise plenary power exercised by the legislature, which may enact any legislation not prohibited by the Constitution.").
Therefore, we turn to Art. I, § 17, and the antecedent right to trial, to determine whether the Constitution prohibits a legislative framework whereby a capital defendant may plead guilty and a jury then determines the penalty. We find that nothing in Art. I, § 17 requires the jury to decide all phases of the trial. We find the redactors' use of the term "case" in Art. I, § 17 is significant in that it describes the process from indictment to sentence.[5] Obviously, the redactors did not intend that while "case" means the process from indictment to sentence, that all portions of the case be decided by the jury. See Perschall v. State, 697 So.2d 240, 255 (La.1997) ("Constitutional provisions should be construed so as to give effect to the purpose indicated by a fair interpretation of the language used, and in the event of conflict or inconsistency, provisions should be construed, if possible, to allow each provision to stand and be given effect."). For example, in Anglo-American practice, acceptance of the plea is not an issue put to the jury. See 4 WILLIAM BLACKSTONE, COMMENTARIES *317. Likewise, motions are not put to the jury. See, e.g. State v. Comeaux, 93-2729, p. 8 (La.7/1/97) 699 So.2d 16, 21("the judge, and not the jury, determines the admissibility of the evidence...."). Instead, from a fair meaning of the term "case," we find the relevant limitation embodied in Art. I, § 17 is that of all the components of a trial, from indictment to sentence, only the issue of the ultimate penalty of death is strictly required to be put before the jury.[6]
*894 Indeed, recalling that Art. I, § 17 contains not grants, but limitations of power (see Aguillard, supra; Polk, supra ), we examine the conduct of the proceeding below and note that step-by-step, Louviere's entry of a guilty plea and the jury's later sentence of death in no way violated the limitations. The indictment against him was a "case," presenting the possibility of punishment that "may be capital," the sentencing aspect of the case was "tried before a jury of twelve persons," "all of whom ... concur[red] to render a verdict[7]" which was the punishment of death. See La. Const. Art. I, § 17.
Nor can it be said that the redactors of the Constitution struck new ground in allowing for a procedure by which a capital defendant could acknowledge guilt, because the common law, on which Louisiana's criminal law is largely based,[8] has allowed this practice for centuries. See Barry J. Fisher, Judicial Suicide or Constitutional Autonomy? A Capital Defendant's Right to Plead Guilty, 65 ALB. L.REV. 181, 182-83 (2001) (noting that a defendant's prerogative to plead guilty, even for crimes punishable by death, was described as early as the seventeenth century in England). Indeed, such procedure today is widespread among the States, with thirty-five of the thirty-eight states allowing pleas of guilt for offenses with possible capital punishment. See id.
The redactors' choice to leave the door open for the establishment of a procedure for a capital defendant to acknowledge guilt might also be said to have been farsighted. As other procedural safeguards have evolved in the criminal justice system, today denying a defendant the choice to plead guilty arguably would impermissibly deprive the defendant, per the federal Constitution, of his strategic choice to acknowledge his crime and thereby appear remorseful before his jury. See id. (Noting that as such safeguards as effective assistance of counsel, knowing and voluntary plea waivers, and discretionary, bifurcated capital sentencing in lieu of a mandatory death penalty all become more entrenched, prohibiting a guilty plea arguably would violate an implicit Sixth Amendment guarantee to the defendant's choice of a defense. Citing Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), the author argues that if a defendant has the right to waive counsel per the Sixth Amendment, then *895 the defendant has the correlative right to require counsel to advance the defense of his choice.[9]). Only this interpretation of Art. I § 17that the legislature is thereby restricted only inasmuch as any capital sentencing scheme must put the penalty issue before the jurypreserves a capital defendant's ability to present a defense of his choice, while preventing the infirmity ultimately found in Ring v. Arizona, 536 U.S. 584, ___-___, 122 S.Ct. 2428, 2443, 153 L.Ed.2d 556 (2002)(sentencing scheme in which judge determines existence of aggravating factors requisite for death penalty violates federal Sixth Amendment right to jury trial) as well as the infirmity recognized in United States v. Jackson, 390 U.S. 570, 571-72, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968)(A federal statute violated the right to jury trial because it "set[ ] forth no procedure for imposing the death penalty upon a defendant who waives the right to jury trial or upon one who pleads guilty," thus "the defendant's assertion of the right to jury trial may cost him his life ....").
In sum, we note that in challenging the constitutionality of La.C.Cr.P. art. 557 the defendant makes only a failed text-based argument, and has not advanced a persuasive policy reason that would support his proposed reading of Art. I, § 17. In contrast, the strategic benefits to a defendant of allowing a guilty plea are not lost upon this court. In the instant case, invoking those benefits, defense counsel during his opening statement aptly pursued and described those benefits: "He's not here today trying to get off on a technicality or a loophole. He's taking responsibility for his actions in the only way that he can: He's pled guilty to everything." We find that the defendant's constitutional argument lacks merit.
Brady Claims (Assignment V)
The defendant argues that the state "suppressed mitigating and exculpatory evidence" in violation of Brady and its progeny. See Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The defendant first urges that the state suppressed a portion of his application to the Thibodaux Police Department in which he disclosed that he had been sexually abused as a child.[10] Second, the defendant also urges that the state suppressed the report of a clinical psychologist, Dr. Guidry, which report was generated as part of the Thibodaux Police employment application process from a pre-employment interview with Dr. Guidry. As a third claim, defendant urges the prosecution impaired his cross-examination of J.R., who was exchanged for the deputy in the jail hostage situation, by failing to turn over letters written by J.R. to defendant. We address each claim in turn.
Before his sentencing hearing, the defendant had issued a subpoena to the Thibodaux Police Department, seeking production of: "A complete certified copy of Chad Louviere's personnel file including his position(s) at Thibodaux Police Department and any and all promotions, employment training, reprimands, and reason(s) for job termination." The district attorney also sent a letter to the department, requesting documents relating to Louviere's *896 employment. In response to the subpoena and letter, the police chief provided various personnel records, including the defendant's application and other documentation relating to his request for employment. However, the police chief did not provide a portion of the application, specifically, a personal background questionnaire, in which the defendant indicated that he was molested as a child, and the police chief likewise did not supply a psychological report by Dr. Guidry, prepared as part of the defendant's employment application. The record shows that these documents were discovered after the jury's sentencing verdict, but before formal sentencing. The record further reflects that these documents first came to light when the newly elected police chief, pursuant to a subpoena in a civil case in which the department was a defendant stemming from defendant's actions in the bank, was looking in a supply room containing files belonging to the former police chief.
The U.S. Supreme Court has explained that "[t]here are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).
As to the second component, suppression, it is undisputed that the prosecution did not possess the defendant's background questionnaire and psychological report. The Supreme Court has stated that even though the prosecution does not possess or have knowledge of evidence, this does not necessarily absolve the state of its responsibilities under Brady because "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." Kyles v. Whitley, 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). In presenting his argument, however, defendant by no means firmly establishes that the prosecution failed in this duty, thereby effectively suppressing evidence. Instead, defendant concedes that in a discovery hearing, in response to defendant's assertion that an investigator who interviewed the employees in the bank after the standoff had produced notes from their interviews,[11] the prosecutor stated: "Judge, early on, I sent a letter to every agency, as you may recall, at Mr. Stone's request saying, `If I don't have everything that you've prepared, send me the balance of it.' I sent it out to every agency. And only Thibodaux responded by sending Mr. Louviere's personnel packet from his employment at the Thibodaux Police Department." Accordingly, it appears from the record that the prosecutor took affirmative steps to obtain any evidence, and reasonably believed that he had obtained from the Thibodaux Police Department all that existed.
Furthermore, the defendant cites no authority for the proposition that the defendant's own response to a background questionnaire falls within the prosecutor's duty to learn of "evidence known to the others acting on the government's behalf" who are acting "in the case ...." See Kyles, 514 U.S. at 437, 115 S.Ct. 1555 (emphasis added). Instead, the weight of authority suggests that the prosecution had no such duty in this case to find *897 evidence held by a former employer that happens to be a police department from another jurisdiction not involved in investigating the offense. See, e.g., Moon v. Head, 285 F.3d 1301, 1309 (11th Cir. 2002)("[A] claimant must show that the favorable evidence was possessed by `a district's prosecution team, which includes both investigative and prosecutorial personnel.'... We have further defined a `prosecution team' as `the prosecutor or anyone over whom he has authority.'") (internal citations omitted). Similarly, there is authority for the proposition that the prosecutor owes no such duty if one focuses on the psychological report itself, which was generated from the defendant's interview during the application process. In State v. Hobley, 98-2460 (La.12/15/99) 752 So.2d 771, a defendant argued that the state possessed his mental health records or at least was aware that he was receiving treatment. In finding no suppression of these records, which were generated while defendant was awaiting trial, we recognized: "Because defendant would have had knowledge of the treatment he received at the mental health clinic, this information cannot be said to have been suppressed by the state." Id. at p. 24, 752 So.2d at 785-86. See also United States v. Newman, 849 F.2d 156, 161 (5th Cir.1988)("The government is not obligated to furnish a defendant with information he already has or can obtain with reasonable diligence."). Compare Strickler, 527 U.S. at 282-83, 119 S.Ct. 1936 (although the third factor of Brady claim, materiality, was unsatisfied, the Court found suppression by failure to disclose investigator's notes showing inconsistencies in identifying witness' statements). Thus, we do not find that the state has suppressed defendant's background questionnaire and the report from his pre-employment interview.
Alternatively, we observe that in the main, the Brady jurisprudence focuses on the materiality inquiry,[12] and under those well-settled principles, we find defendant's arguments fail.
For purposes of ensuring that a defendant's constitutional rights are protected, suppressed evidence is material if its inclusion would establish that "`there is a reasonable probability' that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." Strickler, 527 U.S. at 289, 119 S.Ct. 1936. (Emphasis added). The Court explained the standard of reasonable probability: "As we stressed in Kyles: `[T]he adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'"[13]Id. at 289-90, *898 119 S.Ct. 1936, citing Kyles, 514 U.S. at 434, 115 S.Ct. 1555. The Court concluded that "[T]he question is whether `the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" Id., citing Kyles, 514 U.S. at 435, 115 S.Ct. 1555.
In applying the reasonable probability standard, we turn first to the defendant's claim that his background questionnaire was material inasmuch as "[t]his evidence would have eviscerated the state's suggestion that evidence about Mr. Louviere's prior sexual abuse was unrelated to, or was `concocted' for the purposes of excusing, his actions at the Bank." In our review of the trial record, we note defendant provided extensive evidence to the jury of his alleged sexual abuse as a child.
In his opening statement, defense counsel noted that in a letter written on the morning of the murder, defendant mentioned that he suffered sexual abuse as a child. In addition, defendant's ex-wife, A.L., testified that defendant told her he was sexually abused as a child. Later, defendant adduced the testimony of his mother, who described childhood incidents she later felt indicated abuse. Furthermore, defendant called his childhood friend, T.C., who testified that he returned from his current residence in Hungary in order to testify about allegedly being abused by the same perpetrator as was the defendant. Finally, defendant offered into evidence the police report investigating T.C.'s claims of abuse, in which report T.C. also alleged that his abuser molested defendant as a child.
In light of these offerings, we find defendant had ample and more compelling material with which to demonstrate to the jury that his claims of sexual abuse were not concocted following his arrest. Even so, we continue to evaluate defendant's remaining claims so the evidence can be considered collectively. See Kyles, 514 U.S. at 436, fn. 10, 115 S.Ct. 1555 ("We evaluate the tendency and force of the undisclosed evidence item by item; there is no other way. We evaluate its cumulative effect for purposes of materiality separately and at the end of the discussion.").
Next, just as the Thibodaux Police Department did not uncover defendant's background questionnaire until after the jury's verdict in his sentencing hearing, defendant was not provided with a psychological evaluation report performed by Dr. Guidry as part of his employment application for the Thibodeaux Police Department. Defendant urges that more than the background questionnaire, Dr. Guidry's report was germane to his case.
Describing Louviere, who was then 19, Dr. Guidry opined in his report that "of the 10 clinical scales that reflect correlates *899 of maladaptiveness all of his scales except for the `Gender Role' domain was [sic] within the normal range." In the gender role domain, the only one identified as outside of normal range, the report described "conflicts over sexual identity." For the domain of "Trust vs. Paranoia," which the report also indicates was "within the normal range," the report describes the defendant as "Balanced and cheerful, wary and evasive, stubborn, suggestive of paranoid disorder." The report later relayed Louviere's plans to "attempt a long term marriage." The report indicated that from his "overall age and level of development in his relationship along with the MMPI-2[14] inications [sic] it is reasonable that he continues to be functioning from the basis of experiencing some sexual identity problems. He is at the stage of resolution in which he will attempt a long term marriage relationship with the above identified woman. Depending on the extent that this relationship can fulfill his needs he may or may not experience an emotional crisis in the future."
For purposes of the elements of a Brady violation, we note the report shares with the background questionnaire the issue of suppression, which we found did not occur, and we similarly find that the report fails the materiality requirement as well. In this analysis, we first observe the larger issues focusing on the defendant himself in his penalty hearing: the circumstances of the offense, and the defendant's character and propensities. La.C.Cr.P. art. 905.2. Furthermore, La.C.Cr.P. art. 905.5 provides as relevant mitigating circumstances that "[t]he offense was committed while the offender was under the influence of extreme mental or emotional disturbance;" and "[a]t the time of the offense the capacity of the offender to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or intoxication." La.C.Cr.P. art. 905.5(b) and (e). In sum, and unlike all the Brady cases cited to this court, the potential relevance of this evidence goes exclusively to defendant's moral culpability.[15] The best standard by which we can measure whether the report and other allegedly suppressed evidence would have "put the whole case in such a different light as to undermine confidence in the verdict,"[16] is by comparing the report with other evidence available to defendant in light of the totality of the evidence in this case.[17]
*900 Particularly, although defendant elected not to use it, it is indisputable that he had obtained through discovery from the state,[18] a copy of his records from Bayou Oaks Hospital, a psychiatric hospital where defendant was admitted for inpatient treatment. It is with this evidence that our analysis begins.
Initially, we find it is worthy to note that the Bayou Oaks record was produced when defendant was 18, and like the later Dr. Guidry report, describes defendant in his late teens and several years before the commission of the instant offense. However, while covering much of the same ground as Dr. Guidry's report, the Bayou Oaks record does so in greater detail and in terms of intrinsically greater weight. For example, unlike the report of psychologist Dr. Guidry, the Bayou Oaks record contains a psychiatrist's diagnosis: "Post traumatic stress disorder, delayed onset-309.89," which diagnosis was made by defendant's treating physician, Dr. Thomas Moore, not once, but twiceupon admission and discharge. Furthermore, the report indicates that defendant was referred to the hospital by his family physician, Dr. O. Naul.
The Bayou Oaks report, like Dr. Guidry's report, suggested a connection between defendant's problems and his alleged molestation as a child. However, the Bayou Oaks report also connects the alleged molestation to a specific incident of defendant's conduct, where the defendant "ended up at his girlfriend's house with a gun ...." Indeed, in the Bayou Oaks record, Dr. Moore describes the defendant's presenting "agitated state ... fear of rejection... [and] guilt and anger" as having their genesis in defendant's encounter the week before with his alleged molester. Furthermore, the record contains the evaluation of psychologist, Dr. Durbin, who more comprehensively describes the subject's coping skills than did Dr. Guidry: "It appears that Chad is usually able to function on a satisfactory basis but it is also clear that he may experience periods *901 of marked emotional, cognitive, or behavioral dysfunction such as recently occurred."
Collectively, the opinions in the Bayou Oaks record contain a far more detailed description of conditions which might bear upon defendant's moral culpability. The Bayou Oaks record also contains indicia of greater weight than Dr. Guidry's report: two instances of a psychiatrist's actual diagnosis (compared to no stated diagnosis by one psychologist, Dr. Guidry); around the clock observations of the subject over a period of five days (compared to a single interview by Dr. Guidry); and a psychologist's report based on ten assessment measures (compared to the three measures in Dr. Guidry's evaluation).
The defendant's decision not to utilize the Bayou Oaks record illustrates the immateriality of the background questionnaire and Dr. Guidry's report. While Dr. Guidry's report potentially contains exculpatory or mitigating evidence relating to moral culpability, the Bayou Oaks record does so in fuller measure and carries indicia of greater weight. Additionally, the defense's decision not to utilize the Bayou Oaks record was apparently strategic, and we do not find it reasonable to assume that such a decision would have been changed by Dr. Guidry's report. For all that is potentially exculpatory in both the Bayou Oaks record and Dr. Guidry's report, we note that each report also describe a person who is intelligent and capable of reasoned decisions: "His judgment and insight were fair to good," wrote Dr. Moore; "There is no evidence that would preclude him from working with the Thibodaux Police Department," wrote Dr. Guidry; "[H]is overall level of intellectual functioning is within very superior range," wrote Dr. Durbin.
In addition to Dr. Guidry's report and the background questionnaire, the defendant argues that the state committed another Brady violation by failing to turn over copies of letters written by the inmate, J.R., who was involved in the jail hostage situation. The defendant asserts that the letters were found in defendant's cell during a shakedown following the hostage situation and that some were copied and returned to him, but the prison, in forwarding evidence of the hostage situation to the district attorney, actually forwarded some of the originals. The defendant urges that these letters, written before the hostage situation and in which J.R. expressed interest in developing a sexual relationship with him, are relevant for impeachment of J.R.'s testimony that she was raped, and that the letters therefore should have been made available to him.
The defendant, however, fails to show how the state's alleged omission of the letters rises to a level implicating the Agurs criteria of materiality and significance, i.e., when "evaluated in the context of the entire record." United States v. Agurs, 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). The record shows that the defense had numerous letters from J.R. in its possession, which letters the defense failed to turn over to the state, subsequently resulting in a citation for contempt of a discovery order. Despite the contempt citation, the trial court allowed the defense to fully cross-examine J.R. with the contents of one of the letters that prompted the contempt citation, allowed the others to be filed into evidence, and also allowed the defense to make reference to the fact that the additional letters contained the same type of material. The defense made no further use of J.R.'s letters, but did cross-examine J.R. about similar letters defendant wrote to her. Accordingly, we find no prejudice, as the defense provided extensive evidence impeaching *902 J.R.'s claim that defendant raped her in the jail.
In summation, and in order to evaluate the cumulative effect of the alleged omissions of evidence,[19] we recount our findings. We found that the defendant's disclosure of abuse in his background questionnaire would have shed little or no new light on his case as he presented the allegation of abuse from numerous other sources, including his own writing on the morning of the murder. We also found that the potential of Dr. Guidry's report for exculpatory impact was debatable, but its lack of materiality is best illustrated by the defense's decision not to utilize the more comprehensive Bayou Oaks record. Additionally, we found the letters of J.R. were of minimal import, if any, as the defense had amply set out its theory of impeachment of J.R., who claimed to have been raped in the jail, and the defense held further impeachment evidence to spare.
We next turn to the entire record in evaluating the potential effect of the alleged omissions. See Agurs, 427 U.S. at 112, 96 S.Ct. 2392. In comparison to its alleged omissions, the state advanced a plethora of evidence of the defendant's acts surrounding the murder of Pamela Duplantis. The record contains uncontroverted evidence that defendant kidnapped the six women in the bank, including Ms. Duplantis, and fired a semiautomatic weapon in their midst. The record details the callousness of the murder of Ms. Duplantis as well as numerous instances of violence, domination, endangerment, and nefarious sexual exploitation of several of her fellow hostages. The record further contains uncontroverted evidence that defendant utilized several of the hostages as shields. As described more thoroughly in the Capital Sentence Review, infra, the evidence amply supported the jury's finding of three aggravating circumstances, including prior convictions for aggravated kidnapping and rape. Additionally, the record provides undisputed evidence of defendant kidnapping and wounding the deputy in the Lafayette jail while awaiting trial. Accordingly, we hold that even the sum of the state's alleged omissions would not have "put the whole case in such a different light as to undermine confidence in the verdict." See Strickler, 527 U.S. at 290, 119 S.Ct. 1936, citing Kyles, 514 U.S. at 434, 115 S.Ct. 1555. Thus, the defendant's Brady claims are meritless.

Voir Dire

Juror Sequestration (Assignment VIII)
The defendant argues that the trial court's method of conducting the voir dire examination violated his right to a sequestered jury. Specifically, the defendant argues the court violated La.C.Cr.P. art. 791[20] by failing to sequester those jurors who had survived the state's and the defense's challenges for cause.
The record reveals, and defendant concedes, that the trial court indiscriminately selected the venire panels in open court, then the court examined the panel. Thereafter, the prospective jurors were tendered to the state and the defendant, in turn, for cause challenges. However, citing concerns over publicity, the defendant *903 objected to the trial court's practice of allowing prospective jurors who had been examined and survived challenges for cause to leave the court, in the event that peremptory challenges had not been completed before the close of the court's business that day, with orders not to read about or discuss the case.
In support of his argument, defendant points to the procedure outlined in La. C.Cr.P. art. 788(A) which provides in pertinent part:
After the examination provided by Article 786, a prospective juror may be tendered first to the state, which shall accept or challenge him. If the state accepts the prospective juror, he shall be tendered to the defendant, who shall accept or challenge him. When a prospective juror is accepted by the state and the defendant, he shall be sworn immediately as a juror. This Article is subject to the provisions of Articles 795 and 796.
The defendant further asserts that tendering is subject to La.C.Cr.P. art. 795, which is referred to in the above article and provides, inter alia, that a "juror shall not be challenged for cause after having been temporarily accepted pursuant to Paragraph A of Article 788 unless the challenging party shows that the cause was not known to him prior to that time." La. C.Cr.P. art. 795(A). The linchpin in defendant's argument is that La.C.Cr.P. art. 788 requires that "[t]he prospective juror is tendered first to the state which shall accept or challenge him for cause and then to the defense which shall accept or challenge him for cause and then he shall be sworn immediately as a juror ...." Of course, once sworn, the juror is subject to the sequestration rule of La.C.Cr.P. art. 791.
However, reading La.C.Cr.P. arts. 795(A) (time for challenges) and 788 (tendering jurors) together does not yield the conclusion, as defendant asserts, that a juror must be sworn for purposes of art. 791 sequestration upon the completion of cause challenges. Art. 795(A) simply prohibits further challenges for cause after the prospective juror has been accepted by both the state and the defendant, subject to the exception that the cause was not known earlier. See State v. Marshall, 410 So.2d 1116, 1117 (La.1982); State v. Faulkner, 447 So.2d 1139, 1143 (La.App. 1 Cir. 1984), writ denied 449 So.2d 1345, cert. denied 469 U.S. 848, 105 S.Ct. 164, 83 L.Ed.2d 100. This prohibition in Art. 795(A) in no way infuses a requirement into Art. 788 that a prospective juror must be sworn upon completion of challenges for cause.
Accordingly, the plain language of Art. 788(A) controls: "When a prospective juror is accepted by the state and the defendant, he shall be sworn immediately as a juror." Indeed, being "accepted" implies a discretionary act on the part of the state or the defendant. The truly discretionary challenges are peremptory challenges. See La. Const. Art. I, § 17: "The accused shall have a right to full voir dire examination of prospective jurors and to challenge jurors peremptorily." On the other hand, challenges for cause are based on the premise that as a matter of law, there is an impediment to a prospective juror serving. See La.C.Cr.P. art. 797 (listing grounds such as a juror lacking a qualification required by law) and La. C.Cr.P. art. 798 (listing grounds such as the juror being biased against the enforcement of a statute). Thus, we find that being "accepted" for purposes of requiring the prospective jurors to be sworn as jurors under La.C.Cr.P. art. 788 entails the exercise of both challenges for causes known and peremptory challenges. As a result, the trial court's implementation of sequestration after the exercise of peremptory *904 challenges comported with the statutory requirements.
We also note the trial court zealously sought to prevent prejudice to defendant. The record reveals that the venirepersons were repeatedly admonished by the trial court concerning their possible exposure to outside influences. Furthermore, when the venirepersons were brought back, the trial court again questioned them regarding any prejudicial influences that might impair their ability to function as a juror. Over the course of voir dire, the trial court removed three jurors for cause based on the exposure to pretrial publicity. Notably, the actions by the trial court comport with the protections observed by the highest courts of other states which have found no error in not sequestering potential jurors. See, e.g., Bellmore v. State, 602 N.E.2d 111, 117 (Ind.1993); State v. Black, 815 S.W.2d 166, 180 (Tenn.1991). Thus, we find no error in the application of the statutory requirements. This assignment lacks merit.

Penalty Phase

Cross-Examination (Assignment XI)
The defendant complains that the trial court impermissibly limited his right to cross-examine witnesses. The defendant notes that several of the victims filed civil suits against him, the Thibodaux Police Department, the Lafayette Parish Sheriff's Office, and the Terrebone Parish Sheriff's Office. The defendant urges that the trial court limited his cross-examination by refusing "to allow defense counsel to mention the existence of the civil litigation ...."
We first note that this assertion grossly mischaracterizes the ruling of the trial court, which is borne out by the full record concerning the ruling. The state sought a ruling in limine because of its concern that "the defense may ask the victims questions surrounding the filing of these suits...." (Emphasis added). In prefacing its ruling, the trial court stated: "The defendant has pled guilty to the crime. There will be no trial of guilt or innocence. The issue before the Court or before the jury will be penalty. And in light of those factors and the number of witnesses who were hostage in the bank at the time, I feel that the civil suits would be irrelevant in this proceeding."
Thereafter, defense counsel asked for a clarification of the ruling. Counsel explained to the trial court: "It seems to me there are two categories of persons: There are persons who are plaintiffs in the civil suits; and then there are persons who are co-defendants, along with my client, Mr. Louviere, in civil suits, who may have a bias or interest in terms of their perception of things that occurred. These were not people who were victims of the alleged crime." Defense counsel explained that the existence of the civil suits was relevant for the civil co-defendants "[b]ecause of their status as also having been sued and the effect that may have on their civil liability ...." The court concluded the clarification of its ruling: "But I agree with you that I do not intend to curtail your cross-examination, if it would be relevant to the issue of the trustworthiness of some police officer who is testifying." Accordingly, from the beginning the state sought to exclude questioning the victims about their civil suits, and the trial court clarified that its ruling did not touch upon the defense's cross-examination of the police. At the most,[21] therefore, the ruling *905 was limited in scope to cross-examination of the victims.
Having ascertained the scope of the trial court's ruling, we analyze its effect.[22] In State v. Broadway, 96-2659, p. 24 (La.10/19/99) 753 So.2d 801, 817 we explained:
Confrontation errors are subject to a harmless error analysis. Delaware v. Van Arsdall, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). The correct inquiry is whether the reviewing court, assuming that the damaging potential of the cross-examination were fully realized, is nonetheless convinced that the error was harmless beyond a reasonable doubt. Id. at 684, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674. Factors to be considered by the reviewing court include "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." Id. at 684, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674; State v. Wille, 559 So.2d at 1332. The verdict may stand if the reviewing court determines that the guilty verdict rendered in the particular trial is surely unattributable to the error. Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).
In the instant case, the defendant first maintains that the existence of civil litigation would show interest by J.R. in claiming that she was raped, in contrast to her jailhouse statement that she had consensual sex with defendant. We observe, however, that on direct examination, the state elicited the fact that J.R. had filed suit as a result of the actions in the Lafayette jail. Furthermore, on cross-examination, the defense pursued its theory of bias and interest without objection by the state and without restraint from the trial court: "And you sued Captain Brasseux [the jailhouse hostage negotiator], the sheriff's office, and Wendy Owens [the hostage/deputy] trying to get money through this rape story of yours, haven't you?" Thus, it cannot be said that defendant was prevented from cross-examining J.R. to pursue his theory of bias or interest.
The defendant next urges that he should have had the opportunity to show bias or interest by A.L. The defendant points to A.L.'s cross-examination testimony that after the defendant had earlier directed another bank employee place his AR-15 rifle outside the bank in an effort to demonstrate willingness to negotiate with police, defendant handed a loaded .38 pistol to A.L. late in the evening. Defense *906 counsel then asked A.L. if she knew at the time whether this was the only loaded weapon that defendant possessed. She replied she was uncertain, and testified further that she immediately gave it back to the defendant.
Setting aside for the sake of argument the more reasonable conclusion that A.L. returned the weapon out of fear that the defendantwho was well trained with firearmsheld another weapon, under the Van Arsdall factors we find that the impeaching effect of inquiry into A.L.'s civil litigation would have been de minimis. First, A.L. was not pivotal, in the sense that she was one of three victims of sexual abuse and one of five testifying victims of detention in the bank. See Van Arsdall, 475 U.S. at 685, 106 S.Ct. 1431 (first factor described as: "the importance of the witness' testimony in the prosecution's case..."). On all issues relating to the actions in the bank, including defendant's confinement of the employees, her testimony was merely cumulative, and well-corroborated. See id. Finally, the strength of the state's case is readily apparent: several witnesses saw defendant committing the murder and evidence of aggravating circumstances abounds. See id. Accordingly, even assuming any error occurred in the trial court's limitation of the proposed cross-examination, the sentence rendered was surely unattributable to the error, and the error would not be reversible. Thus, this assignment is meritless.

CAPITAL SENTENCE REVIEW
Article I § 20 of the Louisiana Constitution prohibits cruel, excessive or unusual punishment. Pursuant to La. C.Cr.P. art. 905.9 and Louisiana Supreme Court Rule 28, this court reviews every sentence of death to determine if it is constitutionally excessive. In making the determination the court considers whether the sentence was imposed under the influence of passion, prejudice or arbitrary factors; whether the evidence supports the jury's findings with respect to the statutory aggravating circumstances; and, whether the sentence is disproportionate considering both the offense and the offender. In the instant case, the trial court has submitted a Uniform Capital Sentence Report ("UCSR"), and the Department of Public Safety and Corrections has submitted a Capital Sentence Investigation ("CSI").
The UCSR and CSI indicate the defendant, Chad Roy Louviere, is a white male, who was twenty-four years of age at the time of the commission of the offense. He is one of two children born to his parents. At the time of the offense, Louviere was married to A.L., a hostage in the instant case, for approximately two years. The couple was in the process of divorcing.
The defendant completed the twelfth grade and thereafter earned some college credit. He was employed as a pipefitter helper while in high school and then joined the Air National Guard. Defendant worked for the Thibodaux Police Department for approximately three and one-half years and was also employed by the Robichaux Tile Company. At the time of the offense, he had been employed as a deputy with the Terrebonne Parish Sheriff's Department for approximately five months.
There was one murder victim, Pamela Duplantis, a white female who was twenty-seven years of age at the time of her death. The victim was a mother of one child and her murder was committed in her place of employment.
In mitigation, the defense emphasized Louviere's lack of prior history of criminal activity, his marital problems, difficulties on the job causing emotional disturbance, and his alleged sexual abuse as a child.

*907 Passion, Prejudice or Arbitrary Factors

There is no suggestion in the record that the jury's decision was based on passion, prejudice or any other arbitrary factor. Indeed, we note the trial took place in May of 1999, approximately two and one-half years after the offense. Furthermore, at defendant's request, the trial was moved to Lafayette Parish. Nevertheless, defendant's own actions while awaiting trial regenerated interest in the instant offense after he held a female deputy hostage in Lafayette and allegedly raped a female inmate to whom he was given access, ostensibly to speak about his case, in exchange for the deputy's release. The trial court subsequently granted the state's motion for a change of venue based on pretrial publicity concerns. As a result, a jury was picked from East Baton Rouge Parish and transferred to Terrebonne Parish for trial. The trial court removed three jurors for cause based on their exposure to pretrial publicity. Under these circumstances, defendant fails to show, and nor do we find, that publicity injected an arbitrary factor into the sentencing decision mandating reversal of his death sentence.

Aggravating Circumstances
Jurors found the following statutory aggravating circumstances: the offender was engaged in the perpetration of an aggravated kidnapping, second-degree kidnapping, and aggravated rape; the offender was previously convicted of an unrelated aggravated kidnapping and aggravated rape; and the offender knowingly created a risk of death or great bodily harm on more than one person.
Aggravated Kidnapping, Second-Degree Kidnapping, and Aggravated Rape
As to defendant being engaged in the perpetration or attempted perpetration of an aggravated kidnapping, the state admitted into evidence weapons and handcuffs used as well as the statements of the bank employees who were held captive in the bank. These statements were all essentially consistent and undisputed. One of the hostages was released in exchange for food; another hostage was released in exchange for a police radio. This aggravating circumstance, then, is satisfied by ample evidence.
In addition to the above evidence, the state introduced testimony of several hostages who relayed how the defendant forcibly took a hostage through the bank as he checked for police infiltration and peered out of the windows at the police perimeter. These statements were all essentially consistent and undisputed and thus the aggravating circumstance of second-degree kidnapping is met.
The state further introduced testimony of three hostages who described how the defendant committed various acts of vaginal, oral, and anal penetration. These statements were essentially undisputed. The state introduced evidence of defendant carrying out these acts during the hostage situation, while armed with dangerous weapons, and demonstrating his ability to discharge firearms, and thus the aggravating circumstance of aggravated rape is met.
In sum, the evidence overwhelmingly established defendant's takeover of the bank followed by the shooting death of the victim, who was one of six women held hostage, and the subsequent instances of forced sexual intercourse and oral sex suffered by three of the women, formed a single continuous 30-hour transaction supporting the jury's determination that the victim died during the course of multiple aggravated kidnappings, second-degree kidnappings, and aggravated rapes. See State v. Anthony, 427 So.2d 1155, 1158 (La.1983)(deciding whether a killing occurred *908 during the perpetration of a felony, this court held that the homicide falls within the "ambit of the statute if it was within the `res gestae' of the underlying felony.").

Previous Conviction for Unrelated Aggravated Kidnapping and Aggravated Rape
The state introduced the indictment for the aggravated rape and aggravated kidnapping begun on Bull Run Road. The state also introduced the minutes of the conviction, as well as the essentially uncontroverted testimony of the victim, detailing how she was maced, dragged into defendant's patrol car, driven to a cane field, and acts of oral, anal, and vaginal penetration were committed upon her. Thus, the aggravating circumstances of prior conviction for aggravated rape and aggravated kidnapping are met.[23]

Risk of Death or Great Bodily Harm on More Than One Person
The undisputed and overwhelming evidence shows when defendant entered the bank, he assembled the employees in the lobby. Before he fired the shot that killed Pamela Duplantis, defendant discharged a semi-automatic assault rifle several times into a videotape placed on the tile floor in their midst. Perceiving a risk to himself, he ordered the employees to barricade the windows and used several of the hostages as shields while checking on the activity of police outside. These actions all evidence the defendant created a risk of death or great bodily harm to more than one person.

Proportionality
The federal Constitution no longer requires a proportionality review. Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). Nevertheless, comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Miller, 99-0192, p. 30 (La.9/6/00), 776 So.2d 396, 414. This court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. Pursuant to Louisiana Supreme Court Rule 28, § 4(b), the Terrebonne Parish District Attorney's Office filed with this court a list of each first-degree murder case tried after January 1, 1976, in the parish.
The state's Sentence Review Memorandum reveals that since 1976 jurors in the 32nd Judicial District have returned a guilty verdict in 14 capital cases and recommended the death penalty only one time before the instant case in State v. Sanders, 93-0001 (La.11/30/94), 648 So.2d 1272. However, this court reversed the defendant's sentence and, after remand, the defendant was resentenced to life imprisonment.
Given the scarcity of comparable cases in Terrebonne Parish, it is appropriate for this court to look beyond the judicial district in which the sentence was imposed and conduct the proportionality review on a state-wide basis. State v. Davis, 92-1623, pp. 34-35 (La.5/23/94), 637 So.2d 1012, 1030-1031. The defendant *909 maintains that his sentence appears disproportionate "when imposed upon a person who killed one person by a single gunshot, because numerous defendants who have killed multiple persons receive life sentences." However, this comparison ignores the fact that the instant offense also involved the kidnappings of six womenincluding the deceasedand multiple rapes and incidents of forced oral sex over a 30-hour period, as well as the risk of death to more than one person. The defendant cannot isolate the victim's death from the entirety of his conduct during the instant offense in an effort to make the death penalty seem disproportionate. Certainly, cases are legion in which this court has affirmed capital sentences based primarily on the jury's finding that the defendant killed during the perpetration or attempted perpetration of an aggravated rape.[24] While none of the referenced death sentences rests on the aggravating circumstance of rape when the killing involved a person who was not the rape victim, the evidence of multiple rapes in this case, coupled with the multiple kidnappings and a hostage's death leads inexorably to the conclusion that death is not a disproportionate penalty. Cf. State v. Lavalais, 95-0320, p. 19 (La.11/25/96), 685 So.2d 1048, 1059 ("If we were to hold, based on the small sampling of cases that we have, that the imposition of death is disproportionate simply because other juries recommended life in the preceding cases, we would forever preclude the possibility of imposing a death sentence in a murder for hire case.").
In conclusion, the state has proven not only risk of death or serious bodily harm to more than one person, but two other aggravating factors: the offender was engaged in the perpetration of an aggravated kidnapping, second-degree kidnapping, and aggravated rape; and also the offender was convicted for an unrelated aggravated kidnapping and aggravated rape. Hence, based on the above, we do not find defendant's death penalty to be disproportionate.

DECREE
For the foregoing reasons, defendant's conviction for first-degree murder and his sentence of death are affirmed. In the event this judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court *910 timely, under its prevailing rules for rehearing of denial of certiorari, or (b) that Court denies his petition for rehearing, the trial judge shall, upon receiving notice from this Court under La.C.Cr.P. art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by La. R.S. 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent the defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under La. R.S. 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed, in the state courts.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] Because this case involves sexual offenses, the names of the victims of such offenses will be replaced with initials.
[2] The assignments of error not discussed in this opinion are governed by clearly established principles of law and do not represent reversible error. They are reviewed in an appendix that will not be published but will comprise part of the record in this case.
[3] Art. 557 provides:

Plea of guilty in capital cases
A. A court shall not receive an unqualified plea of guilty in a capital case. However, with the consent of the court and the state, a defendant may plead guilty with the stipulation either that the court shall impose a sentence of life imprisonment without benefit of probation, parole, or suspension of sentence without conducting a sentencing hearing, or that the court shall impanel a jury for the purpose of conducting a hearing to determine the issue of penalty in accordance with the applicable provisions of this Code.
B. If a defendant makes an unqualified plea, the court shall order a plea of not guilty entered for him.
[4] La. Const. Art. I, § 17 provides in pertinent part: "A criminal case in which the punishment may be capital shall be tried before a jury of twelve persons, all of whom must concur to render a verdict.... Except in capital cases, a defendant may knowingly and intelligently waive his right to a trial by jury."
[5] We find support for "case" having this commonly understood meaning in that for purposes of the rights of victims and witnesses, R.S. 46:1844 provides: "`Case' herein shall mean a criminal matter in which formal charges have been filed by the district attorney's office."
[6] The defendant takes out of context, both historically and textually, the significance of this court's sua sponte finding under C.Cr.P. art. 557 (as amended by 1973 Acts No. 134 § 1) under that version of the article, the plea of "guilty with capital punishment" was a theoretical possibility. See State v. Jett, 419 So.2d 844, 851 (La.1982). While we noted this theoretical possibility, we stated that "it is apparent without need for further amplification that a qualified plea of guilty with capital punishment would be prohibited because the law has long been to the effect that a person cannot plead guilty in a manner to bring about his own death. There is a well founded legislative policy against a person accomplishing such judicial suicide." Id. However, under the present version of C.Cr.P. art. 557, a defendant in a capital charge plainly cannot enter the equivalent of "guilty with capital punishment" because of the requirement that a capital sentence may only be rendered after "impanel[ing] a jury for the purpose of conducting a hearing to determine the issue of penalty ...." C.Cr.P. art. 557(A). Thus, contrary to the defendant's argument, the above-described policies in Jett are consonant with our interpretation of La. Const. Art. I, § 17.
[7] We note that "verdict" is defined as: "1. Law. A. The decision of a jury in a civil or criminal cause upon an issue which has been submitted to their judgment." OXFORD ENGLISH DICTIONARY, Vol. XIX, pgs. 522-23 (1989). While defendant would define "verdict" as a jury's possible responses to the guilt phase dictated by the Code of Criminal Procedure's responsive verdict article, La.C.Cr.P. art. 814 (q.v., "The only responsive verdicts which may be rendered when the indictment charges the following offenses are: 1. First-degree Murder: Guilty; Guilty of second degree murder. Guilty of manslaughter. Not guilty.") such an approach ignores the following: 1) that La.C.Cr.P. art. 814 does not purport to be definitional; and most significantly 2) that the Code of Criminal Procedure exists within the bounds of the Constitution, not vice versa.
[8] See generally Dale E. Bennett, The Louisiana Criminal Code: A Comparison with Prior Louisiana Criminal Law, 5 LA. L.REV. 6 (1942).
[9] In explaining the right to waive counsel, the Court in Faretta held: "Unless the accused has acquiesced in ... representation, the defense presented is not the defense guaranteed him by the Constitution, for, in a very real sense, it is not his defense." Faretta, 422 U.S. at 820-21, 95 S.Ct. 2525 (fn.omitted).
[10] At the time of the offense, the defendant was a deputy with the Terrebonne Parish Sheriff's Office. Prior to that employment, the defendant was a deputy with the Thibodaux Police Department.
[11] The issue of the existence of investigator's notes does not form the basis of any of the defendant's Brady challenges.
[12] See, e.g., Kyles, 514 U.S. at 434-454, 115 S.Ct. 1555; United States v. Bagley, 473 U.S. 667, 678-84, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); Brady, 373 U.S. at 87-91, 83 S.Ct. 1194.
[13] The Supreme Court specifically rejected the lower threshold of whether "there is a reasonable possibility that either a total, or just substantial, discount of [the state's] testimony might have produced a different result, either at the guilt or sentencing phases." Strickler, 527 U.S. at 291, 119 S.Ct. 1936 (emphasis in original).

In the instant case, the defendant makes much of a statement in Kirkpatrick v. Whitley, 992 F.2d 491, 497 (5th Cir.1993) to convince this court that his burden is only to show that the evidence would have changed the mind of one juror. However, the statement in Kirkpatrick about the petitioner's burden (q.v., "at least with regard to the punishment assessed, is whether the mind of one juror could have been changed") was dicta: "We express no opinion about the veracity of any of Kirkpatrick's claims." See id. at 497. But more importantly, the Kirkpatrick court made the statement in reference to the petitioner's claim that the prosecution advanced perjured testimony. See Kirkpatrick, 992 F.2d at 497. The Kirkpatrick court recognized earlier in its opinion that the standard for suppressed evidence is different from that of perjured testimony, as suppressed evidence only "merits relief where the information is so material that the prosecution's withholding would deprive the defendant of a fair trial." Id. at 497. The instant case presents no issues of perjury.
We decline to accept defendant's implied standard noting also that it clearly contradicts the Strickler standard, in that hypothetically isolating the decision-making of one juror from the rest of the panel (and without proposing how or why such should be done) the defendant's implied standard would no longer inquire as to whether the "verdict is worthy of confidence," but would overturn a conviction on a lower threshold, apparently the very same "significant possibility" threshold that the Strickler Court expressly rejected. See Strickler, 527 U.S. at 291, 119 S.Ct. 1936.
[14] The report explains that the acronym stands for "Minnesota Multiphasic Personality Inventory-2."
[15] Commenting on policies inherent in Louisiana's capital sentencing procedure, we noted in State v. Hamilton, 478 So.2d 123, 129 (La.1985): "While the character of the defendant is usually irrelevant to the determination of guilt, it is one of the factors on which the determination of sentence is focused."

That the issue of moral culpability remains one of the significant issues in capital sentencing was recently reinforced by the United States Supreme Court in Atkins v. Virginia, 536 U.S. 304, ___-___, 122 S.Ct. 2242, 2247, 153 L.Ed.2d 335 (2002): "For purposes of imposing the death penalty, [defendant's] criminal culpability must be limited to his participation .... and his punishment must be tailored to his personal responsibility and moral guilt." quoting Enmund v. Florida, 458 U.S. 782, 801, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). 536 U.S. 304, ___-___, 122 S.Ct. 2242, 2247 (2002) (emphasis in original). In Atkins, the Court found mentally retarded offenders "less morally culpable...." Op. at ___, 122 S.Ct. at 2251.
[16] Strickler, 527 U.S. at 290, 119 S.Ct. 1936, citing Kyles, 514 U.S. at 435, 115 S.Ct. 1555.
[17] Dean Wigmore addressed some of the difficulties inherent in evaluating evidence offered to prove human traits or conditions, and began his exposition with the mechanics of proving character, an analysis he found applicable to other human traits as well. 161 JOHN HENRY WIGMORE, THE SCIENCE OF JUDICIAL PROOF § 83 (1937). "[W]hen Character ... has to be evidence, a double step of inference is always involved." 164 WIGMORE § 86. These inferences are: 1) "from prior conduct to [development of] character-trait" and 2) "from character-trait to act." In other words, the first inference is that by consistently choosing patterns of conduct, the subject will develop a certain character; the second is that the defendant will act in conformity therewith. As to the report in the instant case, the inferences required are first that the defendant developed a certain character and second, that the defendant answered the interview questions in conformity therewith. However, this points to a third level of inference involved in this case, that the observer has properly conducted the interview and interpreted the data to reach reasoned conclusions. Dean Wigmore recognized this third level of inference when he described that character determinations require two inferences, and that any testimony of character "is itself based on observations of conduct." See id. Dean Wigmore also indicated that the more stages of inference that are involved in a particular matter of evidence, the greater the risk that the evidence presents an erroneous conclusion, because each stage presents "the possibility of erroneous inference." 108 WIGMORE § 54. This court is loathe to say that as a result of the potential for error in opinion evidence bearing on moral culpability, that such evidence can never rise to the level of materiality for purposes of a defendant's Brady rights. However, we note the inherent difficulties of discerning materiality are obviated in the instant case by the existence of other evidence by which we can make a comparison of favorableness of the evidence to the defendant and later assess the effect such could reasonably have been expected to have in conjunction with the other allegedly omitted evidence. See Kyles, 514 U.S. at 436, fn. 10, 115 S.Ct. 1555.
[18] By motion of both parties, the record of this case has been supplemented with the Bayou Oaks record.
[19] "One does not show a Brady violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light ...." Kyles, 514 U.S. at 435, 115 S.Ct. 1555.
[20] La.C.Cr.P. art. 791 provides: "In capital cases, after each juror is sworn he shall be sequestered, unless the state and the defense have jointly moved that the jury not be sequestered."
[21] During the cross examination of the inmate allegedly raped in the Lafayette jailhouse, after the jury had been removed for a hearing on an objection by the state, the trial court referred to J.R.'s testimony in the unadjudicated crimes hearing held after the ruling limiting references to cross examination and stated: "That's why I told y'all that of all the witnesses involving civil litigation, I'd let you cross her on that civil litigation because it's obviously a contested fact, and it goes to credibility. I told you you couldn't impeach or attempt to use on the witnesses who were the victims in the bank any civil litigation because I thought it was not germane to this proceeding." While this statement suggests that the trial court further limited its order, the record does not contain a transcript where such might have occurred.
[22] The state urges this court to find, as did the trial court, that it was proper to exclude cross-examination of the victims on the issue of their civil litigation because such was irrelevant. The state urges that because the defendant pled guilty, any questions to the victims about their civil actions would have no bearing on their potential bias or interest. While such may be the case, we need not embark upon that analysis out of concern for the potential precedent of such a holding, because a defendant has a constitutionally protected right "to confront and cross-examine the witnesses against him ...." La. Const. Art. I, § 16.
[23] Pointing out the aggravated rape and kidnapping occurred earlier on the morning that he later began his siege of the bank, defendant contends his prior convictions are "not prior convictions as that term is typically defined." Whether defendant's aggravated rape and kidnapping of D.D. served as an impetus in some manner for his numerous criminal acts inside the bank later that day we cannot say, but at any rate, "[t]he law intends ... to protect each person offended in that fashion, and each person offended in such a fashion is the victim of a separate crime." State v. Gipson, 359 So.2d 87, 91 (La.1978).
[24] See, e.g., State v. Connolly, 96-1680 (La.7/1/97), 700 So.2d 810; State v. Comeaux, 93-2729 (La.7/1/97), 699 So.2d 16; State v. Martin, 93-0285 (La.10/17/94), 645 So.2d 190; State v. Wille, 595 So.2d 1149 (La.1992); State v. Lee, 559 So.2d 1310 (La.1990); State v. Copeland, 530 So.2d 526 (La.1988), cert. denied, 489 U.S. 1091, 109 S.Ct. 1558, 103 L.Ed.2d 860, reh'g. denied, 490 U.S. 1077, 109 S.Ct. 2092, 104 L.Ed.2d 655 (1989); State v. Eaton, 524 So.2d 1194 (La.1988), cert. denied, 488 U.S. 1019, 109 S.Ct. 818, 102 L.Ed.2d 807, reh'g. denied, 489 U.S. 1061, 109 S.Ct. 1332, 103 L.Ed.2d 600 (1989); State v. Carmouche, 508 So.2d 792 (La.1987); State v. Williams, 490 So.2d 255 (La.1986); State v. Loyd, 489 So.2d 898 (La.1986) (fourth penalty phase hearing presently pending); State v. Jones, 474 So.2d 919 (La.1985); State v. Brogdon, 457 So.2d 616 (La.1984), cert. denied, 471 U.S. 1111, 105 S.Ct. 2345, 85 L.Ed.2d 862, reh'g. denied, 473 U.S. 921, 105 S.Ct. 3547, 87 L.Ed.2d 670(1985); State v. Watson, Jr., 449 So.2d 1321 (La.1984); State v. Rault, 445 So.2d 1203 (La.1984); State v. Celestine, 443 So.2d 1091 (La.1983); State v. Flowers, 441 So.2d 707 (La.1983), cert. denied, 466 U.S. 945, 104 S.Ct. 1931, 80 L.Ed.2d 476, rev'd, 779 F.2d 1115 (5th Cir.1986) (remanded for new trial), 509 So.2d 588 (La.App. 5th Cir.1987)(conviction and life sentence affirmed); State v. Willie, 436 So.2d 553 (La. 1983); State v. Moore, Jr., 414 So.2d 340 (La.1982).