LANDRIEU, J.,
dissents and assigns reasons.
|tFor the following reasons, I respectfully dissent from the majority’s reversal of Lionel Serigne’s conviction of aggravated rape and William Serigne’s convictions of forcible rape, sexual battery, and aggravated incest.
This case involves sexual abuse of children perpetrated by the two defendants, who are brothers, upon female family members, beginning with the molestation of their cousin D.A. in the late 1970’s and early 1980’s. D.A. did not reveal this molestation to anyone until approximately 1992, when, at the age of twenty-one, she attended a family event and saw her cousin, Lionel Serigne, walk into the room carrying his four-year-old niece, M.S., who was also D.A.’s cousin. D.A.’s concern for M.S. prompted her to reveal her childhood abuse by Lionel to her mother, which resulted in a “family meeting” at which D.A. confronted Lionel about his abuse of her. D.A., her parents, Lionel, his parents, his then fiancée, and his uncle agreed at that time to keep D.A.’s accusations private and to handle the matter within the family. D.A. did not reveal then that she also had been abused by William Serigne. She testified that after the family meeting, all contact between her nuclear family and the Serigne branch of the family essentially ceased. Approximately twenty years later, M.S. disclosed that she had been sexually abused as a child by her father, William Serigne. This disclosure prompted D.A. to | ¿report her abuse by both Lionel and William to the police, at the same time that M.S. and a third victim, B.M., came forward with their allegations against William. The grand jury testimony of these three victims led to the indictments of Lionel and William in 2012.
The majority concludes that the evidence presented was sufficient to convict both Lionel and William on the charges of which they were found guilty. I agree with this conclusion. I disagree with the majority’s reasons for reversal of the convictions, which I address separately.
I. Lionel Serigne
The majority concludes that “binding Supreme Court and Fourth Circuit prece *325 dent requires a finding of reversible patent error” in that Lionel was legally precluded from waiving a jury trial because he was charged with a capital offense. This conclusion is based upon what I believe to be a flawed analysis of the law. Lionel Se-rigne was indicted in 2012 and tried in 2013. At no time, from his indictment through his conviction, did he ever face the possibility of being sentenced to the death penalty. When he waived his right to a jury trial, he was represented by private counsel, and he has not assigned as error on appeal that the trial court’s allowing him to waive a jury trial was illegal.[1] The aggravated rape statute (La. R.S. 14:42) in effect at the time of Lionel’s indictment and trial had been amended multiple times since the time period (1976-1983) cited in the indictment for the commission of the crime. In particular, the legislature amended the statute in 1997 to enact a “hybridized” version applicable to the rape of a child.[2] Therefore, at the time of Lionel’s indictment and trial, the statutory lapunishment for aggravated rape was life imprisonment at hard labor, except for the provision in La. R.S. 14:42 D(2), which read:
D 2) However, if the victim was under the age of thirteen years, as provided by Paragraph (A)(4) of this Section:
(a) And if the district attorney seeks a capital verdict, the offender shall be punished by death or life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence, in accordance with the determination of the jury. The provisions of Code of Criminal Procedure Art. 782 relative to cases in which punishment may be capital shall apply.
(b) And if the district attorney does not seek a capital verdict, the offender shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. The provisions of Code of Criminal Procedure Art. 782 relative to cases in which punishment is necessarily confinement at hard labor shall apply.
Article 782 states, in pertinent part:
A. Cases in which punishment may be capital shall be tried by a jury of twelve jurors, all of whom must concur to render a verdict. Cases in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict. Cases in which the punishment may be confinement at hard labor shall be tried by a jury composed of six jurors, all of whom must concur to render a verdict.
B. Trial by jury may be knowingly and intelligently waived by the defendant except in capital cases.
In 2008, prior to Lionel’s indictment, the death penalty as provided in La. 14:42 D(2) was declared unconstitutional by the United States Supreme Court (“Based both on consensus and our own independent judgment, our holding is that a death sentence for one who raped but did not kill a child ... is unconstitutional under the Eighth and Fourteenth Amendments.”) Kennedy *326 v. Louisiana, 554 U.S. at 421,128 S.Ct. at 2650-51.[3] There is no- evidence in this record that the district attorney ever sought the death penalty against Lionel Serigne.
^Nevertheless, the appropriate inquiry to decide whether Lionel Serigne- could legally waive his right to a jury is whether the Í997 amendment “hybridizing” La. R.S. 14:42,- which was in effect at the time of Lionel’s indictment and trial but not at the time of the commission of the crime, should be applied retroactively to him. The majority fails to address this issue. Although neither the Louisiana Supreme Court nor the Fourth Circuit has considered ' this issue, other appellate circuits have. As explained below, after reviewing the applicable law and jurisprudence, I conclude that the amendment is procedural in nature insofar as it delates to the mode of trial. As such, the amended version of La. R.S'. 14:42 was applicable to Lionel Serigne. Under that version, because the State never sought (or could have sought, given its' unconstitutionálity) the de’áth penalty, the trial court’s allowing Lionel to waive a jury trial was not an error, much less an- error patent.
Lionel Serigne was indicted in 2012 for aggravated rape of D.A., “between and including the years 1976 and 1983.” In convicting Lionel, the trial judge found the rape occurred in 1981 when D.A. was ten or eleven. The cases relied upon by the majority stem from 1972 to 1981, an era when Louisiana was grappling with how to adjust , its laws to comply with a series of United States Supreme Court decisions (Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); Selman v. Louisiana, 428 U.S. 906, 96 S.Ct. 3214, 49 L.Ed.2d 1212 (1976); Coker v. Georgia, 433 U.S, 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977)) establishing the unconstitutionality of the death penalty as punishment for certain crimes,, including murder under certain circumstances and aggravated rape. Although technically, Louisiana’s aggravated rape statute provided for the death penalty for the first year, (1976 through Sept. 9, 1977) of the seven-year time span recited in the indictment of Lionel, that penalty had been held unconstitutional by Furman in 1972 and again by Selman in 1976. As noted ^previously, the Louisiana legislature’s subsequent attempt, in 1995, to again provide the death penalty as a possible punishment for the aggravated rape of a child was also held to be unconstitutional before Lionel was ever indicted in this case. See Kennedy v. Louisiana, supra,
In the seminal case cited by the majority, State v. Holmes, 263 La. 685, 269 So.2d 207 (1972), the Louisiana Supreme Court held, with strong dissents by Justices Bar-ham and Tate, that Louisiana’s procedural rules relating to capital cases, specifically the unanimous jury verdict requirement, still applied to cases in which the defendant could have been subject to the death penalty except for the United States Supreme Court’s invalidation of it in Furman v. Georgia. The Holmes Court ’ clearly recognized the impermanent nature of its holding, however, stating:
Although the hiatus is obvious and the situation undesirable, we conclude that we should (at least until the legislative process has reorganized the criminal law and procedure in view of Fur-man) interpret Article 7, Section 41 of *327 the Louisiana Constitution as referring to classes of crimes; and that those which the legislature has classified as capital offenses shall be tried by a jury of twelve, all of whom must concur to render a verdict. ,
Id., 263 La. 685, 691-92, 269 So.2d-207, 209 (1972) (Emphasis supplied). As a result of Furman and Selman v. Louisiana, the Louisiana legislature amended La. R.S. 14:42, effective September 9, 1977, to provide life imprisonment at hard labor as the punishment for aggravated rape.[4] Also.in response to Furman, Holmes, and State v. Flood, 263 La. 700, 269 So.2d 212 (1972), the legislature in 1974 amended La. R.S. 14:30 to classify murder in two categories, first and second degree. The amendment maintained the death penalty as the mandatory sentence for first degree murder but provided life imprisonment, as the mandatory minimum sentence for second degree murder. State v. Washington, 294 So.2d 793, 794 (La.1974). In Washington, the Louisiana Supreme Court faced the issue of whether a defendant charged with second degree murder was prohibited from applying for bail because lfiLa.C.Cr. P. art. 313 then provided that persons charged with capital offenses were not eligible for bail.' The Washington Court again recognized the temporary nature of its prior holding in Holmes, finding:
The issue to be decided is whether the system of ‘classification’■ of crimes _ as announced in Flood and Holmes still applies to render second degree murder non-bailable under C.Cr.P. Article 313.
In Holmes the majority held that even though the United States Supreme Court in its decision in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) declared the death penalty unconstitutional as it was then imposed, this did not destroy the system ■of classification of crimes in Louisiana. In Holmes the majority held ‘ murder should be classed as a capital offense ‘at least until the legislative process has reorganized the criminal.law and procedure in view of Furman.’ Murder, prior to the 1973 amendments, was still classified in the. statute as a capital crime, although the penalty , of death could not be enforced. Accordingly, in Flood, the majority held. that those persons charged with ‘capital.offenses’ were not entitled to-.bail where the proof was evident or the presumption great.-
The legislature has now acte'd ahd reorganized the criminal law in defining murder. The capital offense of murder is, now'defined by R.S. 14:30. Second degree murder under R.S. 14:30.1 is not now classified as a' capital offense. There being no death péñálty 'for the crime with which defendant is Charged, bail must be granted.
Washington, 294 So.2d at 794.
Despite the comparable evolution of Louisiana’s statutory and procedural' law on aggravated rape since the Holmes decision, however, the majority finds not merely error, but an error patent, based upon the fact that, a tangentially-related line of cases following Holmes from 1972 to 1981 has not been overruled. Not one of :these cases is directly on point. Moreover, having been decided long prior to the amended version of the aggravated rape statute in effect at the time of Lionel’s trial, none addresses the issue presented here — which is whether the amendment applied retroactively to Lionel.
In State v. Washington, 02-2196, pp. 2-3 (La.9/13/02), 830 So.2d 288, 290 {per cu-riam ), the Louisiana Supreme Court delineated the two-fold inquiry necessary to *328 determine whether a law should be applied retroactively:
17First, it must be ascertained whether the enactment expresses legislative intent regarding retrospective or prospective application. If such intent is expressed, the inquiry ends_ [T]he second step is to classify the enactment as either substantive, procedural or interpretive.' Substantive laws are laws that impose new duties, obligations or responsibilities upon parties, or laws that establish new rules, rights and duties or change existing ones. Interpretive laws are those which clarify the meaning of a statute and are deemed to relate back to the time that the law was originally enacted. Procedural laws prescribe a method for enforcing a substantive right and relate to the form of the proceeding or the operation of laws.
Laws that are procedural or interpretive may be applied retroactively.
Id. (Citations omitted).
The Louisiana Supreme Court has consistently held that changes in procedural rules made after the commission of the offense, but before the commencement of trial, may be employed at a defendant’s trial. See State v. Loyd, 96-1805, pp. 12-13 (La.2/13/97), 689 So.2d 1321, 1328; State v. Sepulvado, 342 So.2d 630, 635-36 (La.1977), abrogated on other grounds, State ex rel. Olivieri v. State, 2000-0172, 2000-1767 (La.2/21/01), 779 So.2d 735. With regard to the 1997 amendment to the aggravated rape statute, the appellate courts that have addressed the issue have found the amendment to be procedural, and therefore have applied it retroactively.
In State v. Kinsel, 2000-1610 (La.App. 5 Cir. 3/28/01), 783 So.2d 532, writ denied, 2001-1230 (La.3/28/02); 812 So.2d 641, the Fifth Circuit considered the retroactivity of the 1997 amendment to La. R.S. 14:42 D, which, as previously mentioned, created a hybrid capital/non-capital statute for aggravated rape of a child below the age of twelve. In Kinsel, the defendant was tried in 1999 and was convicted by a non-unanimous jury of the aggravated rape of a child under the age of twelve. The time period alleged in the indictment for the commission of the offense was from November, 1992 through October, 1995. For approximately the [Jast three months of that time period, La. R.S. 14:42, by virtue of its amendment in 1995, provided for the death penalty as a possible punishment for the offense. Id., pp. 11-12, 783 So.2d at 539. Moreover, the “trial testimony established, that defendant would have committed at least some of the acts after the 1995 amendment to LSA-R.S. 14:42 became effective, and thus, the death penalty was applicable.” Id., p. 12, 783 So.2d at 539. The subsequent 1997 amendment to the statute, which was in effect at the time of trial, provided that if the State opted to seek a penalty of life imprisonment, rather than death, only ten of twelve jurors were required to concur in the verdict. The State did not seek the death penalty in Kinsel. Nevertheless, the defendant argued that the jury’s non-unanimous verdict was error because the 1997 amendment was not in effect when the crime was committed. The Fifth Circuit rejected this argument, stating:
Although LSA-R.S. 14:42 D(2)(b) was not in effect at the time that defendant committed the alleged offenses, it had been enacted prior to the time of defendant’s trial. We find this procedural provision applicable to the instant case. As a result, the provisions of C.Cr.P. art. 782 were properly triggered when the state did not seek the death penalty. Accordingly, we find that the trial court did not err in failing to require a unani *329 mous verdict for defendant’s aggravated rape conviction.
Id., pp. 12-13, 783 So.2d at 539. Kinsel, although it did not involve the waiver of a jury trial, is similar to the instant case in that the hybrid capital/ non-capital -statute for aggravated rape of a child was in effect at the time of Lionel Serigne’s trial, and the death penalty was available as a punishment for a portion of the time span in which the crime was alleged to have been committed in the indictment. Here, however, the evidence at trial showed the aggravated rape of D.A. was committed in 1981, when the death penalty was not a part of the statute. Moreover, by the time of Lionel’s indictment and trial, the death penalty for aggravated rape of a child had been held unconstitutional in Kennedy v. Louisiana, [nsupra. Therefore, the instant situation presents an even more compel-ling case for applying the version of -La. R.S. 14:42 D in effect at the time of trial.
Relying on Kinsel, the Fifth Circuit in State v. Singleton, held that a defendant convicted in a bench trial of aggravated rape of a child was legally entitled to waive a jury trial, reasoning:
While no cases were found directly on point, the following cases lend guidance for this court’s analysis of this issue. In State v. Louviere, 00-2085 (La.9/4/02), 833 So.2d 885, 893, cert. denied, 540 U.S. 828, 124 S.Ct. 56, 157 L.Ed.2d 52 (2003), the Louisiana Supreme Court noted that the right to trial for criminal defendants derives from Article I, § 16. It decided that nothing in Article I, § 17 required the jury to decide all phases of the trial, from indictment to sentence, and that only the issue of the ultimate penalty of death is strictly required to be put before the jury. In this case, which involved a. defendant who pled guilty to first degree murder, the court found that the Louisiana Constitution did not preclude defendant from pleading guilty and waiving a guilt-phase jury trial.
State v. Singleton, 2005-0622, pp. 8-9 (La. App. 5 Cir. 1/31/06); 922 So.2d 647, 652. On the basis of Louviere, as well as its prior decision in Kinsel, the Fifth Circuit held that because the State did not seek a capital verdict, the defendant was entitled to waive his right to'a jury trial. Id., pp. 9-10, 922 So.2d at • 652. The Singleton court additionally noted that “several cases in which the defendant was charged with the aggravated rape of' a child under twelve have "involved bench trials,” citing: State v. Ross, 2003-0564 (La.App. 3 Cir. 12/17/03), 861 So.2d 888, writ denied, 2004-0376 (La.6/25/04), 876 So.2d 829; State v. Chatman, 37,523 (La.App. 2 Cir. 9/24/03), 855 So.2d 875, writ denied, 2003-2821 (La.2/13/04), 867 So.2d 685; and State v. Holley, 2001-0254 (La.App. 3 Cir. 10/3/01), 799 So.2d 578. Singleton, 2005-0622, p. 10 n. 3, 922 So.2d 647 at 653 n. 3.[5] Relying on this jurisprudence, the Third Circuit, in State v. Craig, 2009-1547 (La.App. 3 Cir, 6/2/10), 2010 WL 2179724 (unpub.), held that a defendant charged with the | inaggravated rape of a child could validly waive a jury trial whén there was no évi-dence in the record that the State had ever sought the death penalty.
Similarly, in State v. Lewis, 2009-0846 (La.App. 3 Cir. 4/7/10), 33 So.3d 1046, writ denied, 2010-0967 (La.11/24/10); 50 So.3d 825, the Third Circuit considered whether to retroactively apply the 2007 amendment to La. R.S. 14:30, relative to first degree murder, providing that if the district attor *330 ney sought life imprisonment rather than a capital verdict, the procedural rules of La. C.Cr. P. art. 782 as to cases in which punishment • is necessarily at hard labor would apply rather than those relating to capital cases. In Lems, the amendment had become effective before the defendant’s trial but after the commission of the two murders with which he was charged. Id., p. 8, 33 So.3d at 1054. The Third Circuit expressly relied upon the above-cited .appellate jurisprudence relative to the retroactive application of the 1997 amendment to the aggravated rape statute., Id. It held that Mr. Lewis, who had pled not guilty by reason of insanity and had been convicted in a bench trial of both counts of first-degree murder, had validly waived his right to a jury because the State had elected not to pursue the death penalty. Id., p. 11, 33 So.3d at 1055.
Recently, in State v. Hypolite, 2013-1365 (La.App. 3 Cir. 5/14/14), 139 So.3d 687, writ denied, 2014-1242 (La.1/23/15), 159 So.3d 1056, the Third Circuit held that since the enactment of the “hybrid” capital/non-capital aggravated rape statute, a unanimous jury verdict is no longer required in aggravated rape cases where the State elects not to pursue the death penalty. In that, case, the defendant was convicted of raping his ten-year-old granddaughter. . The court noted:.
We agree with appellate counsel in that the State made no indication in the grand jury indictment as to whether or not it was charging Defendant with aggravated rape as a capital or non-capital offense. However, there is nothing in the record to indicate that the State was charging Defendant with a capital offense. In fact, the record supports |T1a finding that the State was pursuing a non-capital offense. The trial court informed the jury, without any objection or comment by either the State or the defense, that the possible imprisonment was life.... Finally, as argued by the State in brief, the death penalty was not an option in this case in light of the Supreme Court’s ruling in Kennedy v. Louisiana, 554 U.S. 407, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008), that the Eighth Amendment of the United States Constitution prohibits the death penalty for the rape of a child where the crime did not result, and was not intended to re-suit,, in the victim’s death.
Id., p. 17, 139 So.3d at 699.[6] Accord: State v. Kaigler, 2010-1839 (La.App. 1 Cir. 6/10/11), 2011 WL 3244803 (unpub.), wherein the First Circuit held that a unanimous jury verdict was not required where the defendant was convicted of first-degree murder, and the State did not seek the death penalty.
As previously noted, there is no evidence in this record that the State ever sought the death penalty against Lionel Serigne. Considering the applicable law and jurisprudence, I find that the trial court was not required to apply the procedural rules applicable to capital cases in this case. I therefore' conclude that,'pursuant to La. R.S. 14:42 D(2)(b), the trial court’s having allowed Lionel Serigne to waive a- jury t&l was not-error. '
II. William Serigne
The majority reverses William’s conviction on the. basis that the trial court abused its discretion by denying his motion for new trial and by refusing to order D,A.’s grand jury "testimony for in camera inspection prior to deciding the motion for new trial. The majority finds that William should be granted a new trial because he *331 was unfairly prejudiced by being tried jointly with Lionel. I disagree. On the basis of the record, I do not find that William suffered an injustice or was denied a fair trial because he was tried jointly with Lionel.
The majority begins its analysis by suggesting that the State acted improperly.by withdrawing the separate indictments of these two defendants, |19which were based upon the 2010 grand jury proceedings, convening a second grand jury in 2012, and re-indicting the defendants jointly, based upon D.A.’s 2012 grand jury testimony. In 2010, D.A. told the grand jury that Lionel and William had molested her together but had not been together when Lionel raped her, saying: “There were times where William would be there, and they both would touch me — not during — it wasn’t during the time where there was actual, if you want to call it intercourse, not that both of them were there then.” She further testified that Lionel had penetrated her vaginally at least once, and that William had forced her to perform oral sex on him. She said: “They would both be in the room, you know, touching me. Lionel was more the one that would say do this or do that, and William, would do it.” The majority correctly notes that in 2010, D.A. did not testify that William had raped her or that William had been present when Lionel raped her. Then in 2012, D.A. told the grand jury that on one occasion, William “actually had me sit on top of him,” which incident had not been apparent to her as rape at the time of her 2010 testimony but which she now knew to be penetration. She continued to maintain that although there were times when Lionel and William were together while exposing themselves to her, they were not together when either one penetrated her. She indicated that the incident where William had her sit on top of him occurred downstairs in the basement. The incident with Lionel happened upstairs. D.A. said both Lionel and William were downstairs with her just before Lionel took her to an upstairs bedroom and raped her, with William remaining downstairs and Lionel rejoining William afterward.
Comparing the two testimonies, the majority concludes that the sole reason the district attorney could have had for withdrawing the separate indictments and convening á second grand jury was to obtain a false basis upon which to indict the' two defendants jointly and try them jointly. I disagree. The transcript of D.A.’s 2010 testimony reveals that the grand jurors were then ’ instructed that “oral | ^intercourse,” specifically, “the touching of touching of the genitals of the offender by the victim using the mouth of the victim” fit the definition of aggravated rape. However, as the majority correctly points out, La. R.S. 14:41 was not amended to include oral intercourse in the definition of rape until 2001. Therefore, although oral intercourse was part of the definition at the time the 2010 grand jury met, it was not defined as rape at the time the offenses were allegedly committed. Because the change in defifiition is arguably a substantive change in the law, it is a reasonable possibility that the district attorney convened a second grand jury because he recognized that the first grand jury had been wrongly instructed on the applicable law. This explanation is, at the very least, as plausible as the one suggested by the majority. In any case, it is impossible to determine from this record why the State chose to convene a second grand jury, and the majority’s speculation as to the State’s motive for doing so serves no purpose.
Based upon the second grand jury, the State jointly indicted the two defendants in 2012 for aggravated rape, alleging that .they participated together in the act of. raping D.A. Whether that indictment was *332 proper is not at issue here because neither defendant filed a motion to quash the indictment. La. C. Cr. P. art. 494 provides, in pertinent part: “Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses.” However, according to article 495, objections of misjoinder may be urged “only by a motion to quash the indictment.” As neither defendant filed a motion to quash, the issue of whether the joint indictment was proper is moot.
On appeal, William argues that the trial court erred by denying his motion for new trial, in part because it was unjust to try him jointly with Lionel. In this respect, he adopts Lionel’s arguments regarding misjoinder, severance and the trial 114court’s refusal to review the grand jury testimony. La. C. Cr. P. art. 851, governing motions for new trial, states, in pertinent part:
A. The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
B. The court, on motion of the defendant, shall grant a new trial whenever any of the following occur:
(1) The verdict is contrary to the law and the evidence.
(2) The court’s ruling on a written motion ... shows prejudicial error.
[[Image here]]
(5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right.
The above-cited grounds are the only Article 851 grounds arguably raised by the defendants’ motions for new trial.[7] A trial court’s ruling on a motion for a new trial will not be disturbed on appeal absent a clear showing of an abuse of discretion. State v. Cox, 2010-2072, p. 1 (La.11/19/10), 48 So.3d 275 (citing State v. Humphrey, 445 So.2d 1155, 1160 (La.1984)). Specifically with regard to the “ends of justice” ground expressed in art. 851 B(5), the Louisiana Supreme Court has stated:
In deciding whether the trial court in the matter before us abused its great discretion in granting a new trial solely on La.Code Crim. Proc. art. 851(5), we keep in mind two precepts. One, in this provision the trial court is vested with almost unlimited discretion and its decision should not be interfered with unless there has been a palpable abuse of that discretion. State v. Bolivar, 224 La. 1037, 71 So.2d 559, 560 (1954). Two, “[t]he motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.”
State v. Guillory, 2010-1231, p. 4-5 (La.10/8/10), 45 So.3d 612, 615-616.
| tfiWilliam essentially argues that his being tried with his brother was unfairly prejudicial to him because there was no evidence to indicate that he and Lionel acted together in molesting D.A. At trial, D.A. clearly testified that Lionel and William raped her on separate occasions in *333 separate areas of the Serigne house (Lionel in an upstairs bedroom and William in the basement).
A trial court’s denial of a motion to sever will not be disturbed absent a clear abuse of discretion. State v. Everett, 2011-0714, p. 33 (La.App. 4 Cir. 6/13/12), 96 So.3d 605, 629. Whether justice requires a severance must be determined by the facts of each case. State v. Nora, 2013-0892, p. 10 (La.App. 4 Cir. 6/18/14), 143 So.3d 1237, 1245. A defendant is. not entitled to a severance as a matter of right; the decision is one resting within the sound discretion of the trial court. Id.
Under these guidelines, I cannot say that the trial court abused its discretion by declining to grant William a new trial. In his argument that trying him with his brother was unjust, William points to the State’s repeated references to “family secrets” in its opening statement.. The majority finds that William was unjustly prejr udiced by being tried jointly with Lionel because the trial court indicated in its reasons for judgment that “as a result of this [D.A.’s allegations of abuse by Lionel] remaining a family secret ... another young woman [and then ultimately, a third person] ended up at stake.” I disagree that these comments demonstrate prejudice or injustice to William.
In order to determine whether William was unfairly prejudiced by the joint trial, it is necessary to consider the evidence heard by the trial judge. The State’s primary witnesses at trial were the three victims and their respective mothers.[8] 11fiBoth Lionel and William Serigne then testified in their own defense.[9] The testimony is. summarized as follows:
D.A. and her mother, M.M.
At the time she testified, D.A. was forty-two years old and the mother of three children, who were then ages twenty-five, eighteen and thirteen. D.A. testified she had been sexually molested on multiple occasions by her cousin, Lionel, beginning in approximately 1975 when she was four years old, and also by Lionel’s younger brother William, beginning when she was about nine years old. She testified that both cousins had stopped abusing her by 1984, at which time she was thirteen.
D.A.’s mother, M.M., testified that she had three daughters, one of whom was D.A., who was born on December 27,1970. M.M. was married to the defendants’maternal uncle, making the defendants, Lionel and William, D.A.’s first cousins. From the time D.A. was born until early 1976, her family resided on Florissant Hwy., one lot over (a vacant lot with a large oak tree was in between the two homes) from the defendants’ (Serigne) home. The two famines saw each other every day during that period. The children played together, going' in and out of the respective family homes during the day.' The Serigne family home was raised, with a large cinder-block-enclosed basement area divided by an inside stairwell going up to the living area of the residence. According to D.A., Lionel (eleven years older than her) began abusing her in the basement of the Serigne home during the time her family lived next-door. After her family moved to Ycloskey when D.A. was five, the incidents of abuse by Lionel and William, who also began *334 abusing her when he 'became a-teenager, continued whenever she visited her paternal grandparents, who lived across the street from the Serigne’s.
|17D.A. testified that she told no one about-'the abuse at the time because she was scared of the defendants and of their mother, who was “mean”' The abuse continued until 1984. D.A. kept quiet until sometime in 1991 or 1992 when she attended a family reunion at the Ycloskey Community Center. She was about twenty-one years -old at the time. D.A. got upset when she saw her cousin Lionel-walk into' the room holding her younger cousin, M.S. (approximately four years old at the time), who was William’s daughter. D.A. testified that when she. saw the two of them together, she got “sick” and called her flanee, B.A., to come get her, which he did. D.A. then told her fiance about what Lionel had done to her. D.A,’s mother, M.M., was also at the reunion and noticed that Lionel and William came in together, with Lionel carrying M-S. When M.M.- looked for D.A., she was' told her daughter had left crying. Later that night, D.A.’s fiance came to M.M.’,s home and told, M;M. what her daughter had said to him about Lionel. M.M. spent the whole night crying. When she- did talk to her daughter, D,A. confirmed that Lionel had molested and raped her at the house on Florissant Hwy,
A day or so later, D.A. and-her parents met with Lionel, his parents, and- his then fiancée,- P.S., at a home across from the Serigne family boat launch -in Delacroix. At this meeting, D.A.- confronted Lionel with her accusations, which he denied. There was screaming and shouting. M.'M. recalled the meeting as being vicious, saying things got physical. D.A. “got in [Lionel’s] face.” When he refused to admit anything, she punched him. The meeting concerned only Lionel, as D.A. had not yet told anyone about William, and did not mention him at the meeting.[10] No one went to the police as a result of the meeting because the family members decided to take care of “it” themselves. M.M. said she agreed to this Indecision because she was stupid, and because her husband’s family was too prideful to admit they had any skeletons.
Approximately eighteen years after the family meeting, William’s' wife, J.B., went to see D.A.[11] J.B. had’ just learned of accusations of childhood sexual abuse made by her then twénty-one-year-óld daughter, M.S., against her father, William. D.A. told J.B. that if there was anything she' could do to help M.S., she would do it. As a result of J.B.’s visit, D.A. went to the St. Bernard Parish Sheriffs Office on November 9, 2009, and gave a statement to Detective Rogers detailing, her childhood abuse by Lionel and William.[12] D.A. confirmed at trial that William-had once apologized to her, as she had told Detective Rogers.
At trial, D.A, was shown photographs depicting her and other family members, including the defendants, at various ages, to aid in her recollection of- the specific incidents: of abuse.[13] ■ Although -she could not give the exact dates and times she was *335 molested, she could judge based on hér appearance as compared to that of the defendants at particular times. She therefore “guesstimated” the .dates, when the incidents of molestation had occurred, using the photos as a timeline for the events.
When D.A. was four, Lionel would sit her down in a room in the Serigne basement. There was a freezer and “bags of salt in there.” Lionel, who would have been fifteen at that time, would expose .his erect penis to her, grab her hand, and then make her put her hand on his penis and leave it there. D.A.’s mother recalled that one time when D.A. was about four, she had come home from playing with her panties inside out but did not have an explanation, except to say she had gone to the bathroom. Lionel was still making her touch his penis when D.A. was seven. She remembered that there was fluid, which he would want her to touch. 11flLionel sometimes would take off D.A.’s pants and panties, look at her vagina, and masturbate. He also would take her hand, put his semen in it, and ask her to put her hand in his mouth. If she refused, he would put the semen on his' own hand and put it in her mouth. When D.A. was about seven and one-half years old, Lionel began touching her vagina with his fingers while he stood looking, with an erection. When asked whether there was anyone else involved at that time, D.A. said no. Lionel did these things to her whenever she and her family went to her paternal grandparents’ home.
D.A. was shown a photograph from December 1981, when she was about eleven, and was asked by the prosecutor: “[Sjometime between 1978 and the- end of 1981, was there any different sort of activity between you and Lionel?” D.A. replied yes. She said that once during that time period, Lionel took her into a bedroom in his family’s home on Florissant Hwy., removed her bottoms, “forced himself on top of her, and put his penis in her vagina.” She knew he had put- his penis inside her because: it hurt. He was moving while on top of her, which hurt and burned, but it did not last long.
There were no other incidents involving penetration by- Lionel: However, by December of 1981, William was also molesting D.A. He would expose his erect penis to' her in the basement, wanting her to take off her panties and her‘bottoms, and would then touch and look at her. Over the years he got more aggressive, wanting her to hold his penis in her hand and to taste his semen, and putting it on her lips. About January of 1988, when she was twelve years old, William took her in the basement, sat on the bags óf salt with his pants off, had her sit in his lap with her panties off, and put his penis in her vagina. It hurt, but there was no movement because she stopped him and got up. D.A. said that this one instance, which occurred sometime between 1981 and 1988, was the only time William penetrated |2nher. Both defendants stopped molesting her sometime in 1984, by which time D.A. had stopped going to her grandparents’ home.
M.S. and her mother, J.B.
M.S., the daughter of J.B. and William, was twenty-six years old on the date she testified at trial. Her allegations of abuse by her father first came out on Thanksgiving night in 2008, when she was twenty-one. After leaving a friend’s bar with her father, m,other, and boyfriend, the group stopped at the Par 3 Diner to get something to eat, but it was closed. M.S., who was drunk, was 'beating on the back door of the diner when her father-grabbed, her arm to get her to leave.. When; he did, M.S. yelled at him, telling him not to touch her. According to her mother, J.B., M.S. told William: ,“[D]on’t fing touch me ever again. You know what I mean ...” M.S. *336 testified that no one except her father knew what she really meant when she said, “I’m tired of you touching me.” Her boyfriend, E.N. did know because she had told him she had been sexually abused by her father. When M.S.’s mother, J.B., asked her what she meant, M.S. turned to . her father and said, “Why don’t you tell her?” J.B, then got into the car with M.S. and E.N. to drive them home. On the way, both M.S. and her boyfriend were crying. J.B. pulled the car over in front of a Burger King and asked them what was going on. J.B. had never seen E.N. crying. E.N. told her to leave him out of it, and that he had “promised” not to say anything. M.S. blurted out, crying: “Mom, this has been happening a long time. Dad has been doing this a long time to me.” M.S. said it had been happening since “Lynn Oaks,” which was the school she had attended from pre-kindergarten through second grade. At trial, M.S. said she really did not know why she had not told her mother before, except that she did not think she would have come out with the allegations if she had not been intoxicated. Also, because she was living with her boyfriend at the time, she felt she was in a safe, comfortable and secure place.
I When the three of them arrived at E.N.’s home, William was sitting in his truck outside. William and M.S. got into a confrontation in which William called his daughter a liar. When M.S. went inside E.N.’s residence for the night, it was the last time she ever spoke to her father. When J.B. went home that night, William again insisted that M.S. had been lying. The next day, J.B. went to E.N.’s to talk with her daughter, who said her father had been making her touch his penis and had been touching her vagina for as long as she could remember. M.S. told her mother she did not want to be around her father anymore. When William got home that day, J.B. again asked him whether M.S. had been telling the truth. William never answered her but took the palms of his hands, leaned on the kitchen bar, and began crying. J.B. said M.S. did not want to go to the police yet because she wanted to make sure it was the right thing to do.
The first incident of abuse M.S. remembered happened when she was about five or six years old and in the first grade. At this time the family was living in a double-wide trailer on Suzy Drive. It was a night when her mother was at bingo, which J.B. used to play three or four nights a week. On these evenings William would watch the children. M.S. and her father were hiding in a closet while playing hide-and-go-seek with her younger brother. M.S. felt her father’s erect or partially erect penis “[ijnside of his boxers or briefs, whatever they were,” on her backside, her buttocks. The second incident occurred in the same trailer in her parents’ bedroom, also when her mother was at bingo. M.S. was little older. She remembered standing while her father sat on his bed and touched her vagina with his hand, over her underwear. Her mother came home, and she ran out of the master bedroom. She remembered that her mother had won a bingo “pot” that night and was excited about it. Her father also came to M.S.’s bedroom in the trailer “numerous times” between 3:00 and 4:00 a.m., before he left for work. William worked at the Serigne Boat Launch and generally arose at approximately | gg3:30 a.m. On these occasions he would “creep up next to M.S.’s bed,” “work” one of his hands underneath the blankets, and touch her vagina over her underwear. She would not really be sleeping because she “knew he was coming.”
The family moved to Sylvia Blvd. in 2001. The early morning incidents of molestation continued there, where M.S.’s bedroom was on the second floor, directly *337 above her parents. She said the molestation ceased when she was around the age of twelve.[14] J.B. said that when the house on Sylvia Blvd. was. eventually sold, the buyer asked her to. inspect the attic. At that time, she noticed lights, graffiti and wine bottles,, which led her to question M.S. M.S. admitted that she used to go up to the attic to hide from her father so he would not wake her up in the morning. M.S. was sad about the abuse, knowing that what her father did was not right, but at the same.time being afraid to say anything. She did not tell her mother at the time because she was afraid, ashamed, confused, and scared. Keeping the knowledge inside, however, ate her up and made her angry.
In. junior high and high school, M.S. began to act up. Her grades.dropped, and she began drinking alcohol and using drugs. She ran away from home a few times. M.S. began dating E.N. when she was fifteen, and the relationship lasted until she was twenty-two. When M.S. was. about sixteen, she ran away, came home drunk, and had a very aggressive argument with her mother, whom she slapped. Afterwards M.S. went upstairs and slit her wrist, resulting in her being placed in “River Oaks” (a psychiatric treatment facility) for a time. She did not report any sexual abuse by her father to her therapists while she was at River Oaks.
M.S. agreed with her mother’s description of her as a “Daddy’s girl.” She explained the loving message on a Father’s Day card she had given William since the alleged abuse by saying that she did love her father, but was not happy he was | Pathe father she had. Despite what he had done to her, she was grateful to him for having provided her family, noting that her mother did not have to work and was able to be a full-time mother, M.S. acknowledged that she had never really wanted for. anything growing up because money was never an issue.
M.S. said that although her father never instructed her not to tell anyone about the molestation, it was understood. M.S. did not go to the police immediately after the Thanksgiving 2008 revelations because she said she wanted to give her father time to admit what he had done, but' he never really did. She first talked to a police detective in 2009, and eventually gave a taped statement.
M.S. was asked if she- could tell her mother almost anything, to which she responded: “Now, I can.” J.B. confirmed that she left William shortly after M.S.’s revelations. J.B. and M.S. lived for almost two years with J.B.’s sister, S.B., her fian-cé and their daughter, B.M. J.B. confirmed that in 2008, when she went to see D.A. about M.S.’s allegations, D.A. lived on Sylvia Blvd. down the block from where J.B., William and their children were living at the time. D.A.’s son and J.B.’s son were friends. J.B. also confirmed that she and William had -not lived together since November or December of 2008 and remained divorced as of the time of trial.
B.M. and her mother, S.B.
B.M. was seventeen years old and in the eleventh-grade at the'time of trial. Her mother, S.B., is the sister of J.B., who was then married to William. J.B. is therefore the aunt of B.M., and William is B.M.’s uncle and godfather. In October, 2004, when she was eight years old, B.M. went to a Halloween party at another aunt’s home with her mother, father and brother. *338 Many other family members were there, including William and J.B.
B.M.’s parents gave William a ride home because his wife had left the party early. William carried B.M. to the car and sat her in his lap in the back seat. |mB.M.’s father was driving and her mother was in the front passenger seat. During the drive, B.M., who was half asleep, awoke to William touching her on her vagina, underneath her clothes. He touched her inside of her body. The touching lasted a few seconds and stopped when they dropped William off at home. B.M. did tell anyone at the time because she thought everyone would be angry at her. She finally told her mother, S.B., at a bingo hall sometime between 2005 and 2008, after Hurricane Katrina. She just blurted it out, began crying, and cried the entire. ride home. S.B- said B.M. made this revelation in 2008 about two weeks after the incident in the parking lot of the Par 3. Diner when M.S. had yelled at her father.' S.B. wanted to talk to her sister, J.B., before going to the police. Although B.M. begged her mother not to tell J.B., S.B. did tell her. B.M. believed it was her parents who ultimately made the decision to go to the police. B.M. confirmed that she met with Detective Michelle Rogers in August of 2010, at which time B.M. was fourteen years old. Prior to the time B.M. spoke to Det. Rogers, J.B. had lived with B.M.’s family for a period, during which time J.B.’s daughter, M.S., frequently slept over. When M.S. spent the night, she and B.M. would sleep in B.M.’s bedroom, and they would talk about William’s sexual abuse - of -them. These conversations were taking place for about one and one-half years prior -to B.M.’s interview with Det. Rogers..
Lionel Serigne
Lionel, who was fifty-four at the time he testified, confirmed that he was eleven years older than his cousin, D.A., and seven years older than his brother and co-defendant, William. Lionel began working at his family’s boat launch/marina when he was twelve, selling ice and shrimp and catching shrimp. After-high school he attended Nunez-- Community College for a few years and then worked a succession of jobs. After being laid off from his last job two years prior to trial, he 12Bwas again working at the boat launch, as well as doing some independent contract work in marine electronics.- -
Lionel denied that he had ever molested D.A. He said that from the time he got his first car at age fifteen, he did riot see much of his family because he was busy with school, \Vork, hanging out with friends, and playing sports. After D.A.’s family moved away from Florissant Highway in 1976, they still came back to visit D.A.’s paternal grandfather, who was also Lionel and William’s grandfather. Lionel indicated that D.A. had played with his younger brother, J.'J.S., who was approximately her age, and that his grandmother had kept a close eye on all the children.
Lionel began dating his first wife when they were freshmen in high ’ school and married her when he was twenty. He testified that they were both virgins when they got married. After marrying they lived for a year in a trailer on the Floris-sant Highway property. Lionel described the basement of the Serigne house as having a garage" door and next to it, a single door that was the primary access to the basement, as well as a door on the other side that was kept locked. There were no interior doors except for One to a narrow closet under the walled stairway leading up to the house. According to Lionel, there were no bags of salt stacked in the basement. He said they had no use for salt at the marina and did not sell salt. He said his uncle, J.M., stored salt at his home in Ycloskey. When shown a photo *339 graph depicting a bag of something under a piece of furniture, Lionel said it was not salt but might be corn, which they used for deer hunting.
Lionel met his second wife, P.S., about one year before their August 1, 1992 marriage. Before they got married, Lionel told P.S. that his uncle, J.M., had molested him in his grandmother’s basement three times when Lionel was between eleven and twelve years old. Lionel had never told anyone else about these incidents. He told P.S. because he was afraid he would lose her due to the [ 2f¡accusations being made against him by D.A. At the family meeting in Delacroix, P.S. confronted Lionel’s uncle about his molestation of Lionel and accused the uncle of having molested his own daughter. Lionel recalled that his uncle had responded by saying he would touch his children any way he wanted to and that it was nobody else’s business. Lionel again denied that he had ever touched D.A. in a sexually inappropriate manner, saying that there was no way he would do that to anyone because it had been-done to him.
William Serigne
William denied all the allegations made against him by the three alleged victims: M.S., B.M., and D.A, At the time of trial, William was forty-seven years old and was divorced from J.B., the mother of his daughter, M.S., and his son, W.S. His son was living with him. William worked at the Serigne’s marina/boat launch, where he had been working for as long as he could remember, since elementary school when he had begun helping his father there. William normally got up at 3:30 a.m., got to the marina at 4:15 a.m., and did not leave there until 5:00 p.m.
William said his daughter, M.S., was nine or ten when she began coming to the marina. She operated the cash .register and was in charge of the inside .until she was perhaps thirteen or fourteen. They lived in a trailer before moving to a residence on Sylvia Boulevard in 2001. William said that hiost of the time if M.S. was coming to work with him, she would be up. Sometimes his wife, J.B., would go to get her, or William would holler for her to come, or he would knock and tell M.S. it was time to roll. If M.S. was not up and ready to go, he would leave without her. William testified that he had a great relationship with M.S. until she was about age fourteen, except that he had to be the disciplinarian. He. said M.S. became a completely different -person when she reached high school age. She was drinking, using drugs, and lying to him and J.B. .One time M.S. cut her wrists 127after slapping J.B., which led to her being placed .in River Oaks for a while. At fifteen or sixteen, M.S. wanted to be emancipated, and at seventeen she wanted them to leave her alone. During that time, M.S. never accused William of having molested her, nor was he ever informed by anyone at River Oaks- that M.S. had made, such an accusation while there.
In November, 2008, M.S. was enrolled in the Paul Mitchell cosmetology school in Slidell. She had expressed a desire to transfer to the Paul -Mitchell school in Chicago, where her boyfriend; E.N., lived, but William and J.B. refused to pay for her tuition. They had taken out a loan to pay the tuition for the school in Slidell, and were unwilling.to borrow more money. On Thanksgiving morning of 2008, M.S. stopped by the home where the family was having Thanksgiving dinner to say hello and then left.- Later that evening William and J.B. were with M.S,, her boyfriend, E.N., and .many other family members at a bar. M.S. became intoxicated toward.the end of the night and did not want to leave when the bar was closing. Finally, M.S. and E.N. left, and they all ended up at the *340 Par 3 Diner to get something to eat. When he and J.B. pulled in behind E.N.’s car, E.N. ran to them saying that M.S. was going nuts, beating everything up. M.S. jumped out of E.N.’s car and banged on the door of the closed diner. William went to get her, preventing her from running onto Judge Perez Highway. He grabbed her, threw her in the back of E.N.’s car, and told him to take her home. William got back into his car, but M.S. ran out again to the opposite side of the diner. William followed her, whereupon she said: “Stay away from me, you [expletive] child molester.” William was shocked by her statement. J.B. came over and asked him if he had heard what his daughter had called him. ' He went home alone and did not know what time J.B. arrived home. Later he and J.B. had a discussion in the kitchen about what M.S. had said, during which William was upset and crying. J.B.’s attitude toward William changed at some point around that time. William testified Lsthat he still cried every day. He denied having molested his daughter. He said that being accused of that made him feel dead inside.
William confirmed that he was asked by the St. Bernard Sheriffs Office to provide a voluntary statement with regard to the accusations by M.S., which he did, denying that he had ever molested M.S. He had never played hide and seek with his son, W.S., and M.S. He had never gone into a closet with M.S. for any reason. He had never gone into M.S.’s room in the-'early ■morning hours to awaken her, or for any reason. Instead, he would knock on the wall or holler for her to get up, telling her they had to go (to the boat launch). After M.S. made the accusations, -he had no more contact with her. After a year or two, he stopped paying for M.S.’s- automobile insurance, her car, and the Paul Mitchell school tuition.
William confirmed that he was approximately four years older than his cousin, D.A., whom he was accused of raping. He had lived on Florissant Hwy. until he was about twenty years old. D.A. also lived there, but the only time William played with her was when the family had get-togethers. William’s mother was very strict and watched him and his brothers like a hawk. If William went into the basement to get the tire pump for a flat tire, his mother would call for him, asking him what he was doing down there. William said he had never put a hand on D.A., and had not raped her or molested her. He denied that he or his brother had ever gone into the basement with D.A., and said he had never even seen his brother around D.A. He testified that his family did not use salt at the boat launch or keep bags of salt in their basement or on their property. His.uncle, J.M., who was a commercial shrimper, did stockpile salt on his property. According to William, the only time he ever spoke to D.A. was when they were older and he lived near her on Sylvia Boulevard. He said that during the three or four years he | ^lived there, D.A. dropped her children off at his house no less than once or twice a week to play with his kids.
Regarding the allegations made by B.M., William said that B.M. was his goddaughter, and her father, D.M., was his best friend. D.M.’s mother, S.B., was the sister of William’s ex-wife, J.B. After the October 2004 family Halloween party, D.M. and S.B. gave William a ride home in their Chevrolet extended-cab pickup truck. B.M. and two other children were also in the truck. As William got into the back seat of the truck, S.B. handed the sleeping B.M. to him. He handed B.M. off to S.B. when they got to his home. He denied that he had touched B.M. inappropriately that night or ever. After that night, William and his family continued to associate *341 with D.M.’s family. They went on almost every vacation together, and evacuated together from Hurricane Katrina to the same Birmingham, Alabama hotel. After travelling from there to Lafayette, Louisiana, for a period, the two families moved to the same property in Mandeville, where they lived in campers until they were able to return to St. Bernard Parish. At this time, B.M. had not yet accused William of having molested her.
Considering the testimony, I cannot say that the trial court’s reference to there being a “family secret” is inconsistent with the evidence presented at trial. The State had to present evidence to explain why the alleged acts of molestation did not come to light until nearly three decades after they occurred. D.A. did not disclose her childhood sexual abuse until she, as a young adult, became upset when she saw her cousin Lionel, one of her former abusers, walk into a family function carrying her four-year-old cousin, M.S. It is undisputed that the authorities were not contacted at that time because certain family members met to address D.A.’s accusations against Lionel, and it was decided at this time that the matter would be handled privately by the family. From this testimony, it is reasonable for the trial | sncourt to infer that had D.A. reported her abuse to the police then, the molestation years later of two other young family members by William may not have occurred.
The testimony demonstrates that, the pertinent facts in this case actually are so intertwined that it would be difficult to separate them. Nevertheless, at trial the charges against the two defendants were clearly differentiated. There is nothing in this record to suggest that the trial judge, who was the trier of fact, did not understand'or appreciate the separate allegations against each. There was no potential for juror confusion because there was no jury. The defendants did not try to point the finger at each- other, or assert antagonistic defenses.[15]
Despite the fact that the defendants were being tried together, the trial judge heard D:A.’s unequivocal testimony that Lionel and William were not together when she was raped by each. Lionel was convicted of ,one. count of aggravated rape of D.A. based upon one occurrence, which D.A. testified happened in an upstairs bedroom when he got on.top of her. William, who was charged with two counts of aggravated rape of D.A., was convicted of only one count of forcible rape, presumably based upon D.A.’s testimony as to the one incident in the basement when William had her sit on his lap and then penetrated her. William was also convicted of one count of sexual battery as to his goddaughter and one count of aggravated incest as to his daughter. The record does not demonstrate that an injustice was done to William (or to Lionel) as a result of the two defendants being jointly tried. I therefore find that the trial court did not abuse its discretion by denying William’s motion for new trial.
Moreover, while I agree with the majority that the trial court erred by declining to review D.A.’s grand jury testimony in camera, I do not agree that this error warrants a new trial for either defendant. To the extent that the grand jury | S1 testimony contains undisclosed Brady evidence, such evidence does not warrant a new trial unless it is material. Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. *342 763, 766, 31 L.Ed.2d 104 (1972). Evidence is material “only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different,” U.S. v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (adopting materiality test from Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). A “reasonable probability” is a probability sufficient to undermine confidence in the outcome. Id.
In the present case, the trial court did not have the opportunity to consider what evidence contained in the grand jury testimony would be subject to disclosure under Brady, or whether the non-disclosure of that evidence is material, so as to warrant a new trial for either defendant, Because the trial court did not rule on these issues, there is nothing for this court to review. Those issues would be better developed' in a póst-conviction posture, where the trial court can conduct a thorough evidentiary hearing. See State v. Wells, 2011-0744, pp. 5-6 (La.App. 4 Cir. 4/13/16), 191 So.'3d 1127. Therefore, I would pretermit those issues and preserve them for the defendants to raise on application for post-conviction relief, where a sufficient record may be developed. See Wells, supra-, State v. Neal, 2000-0674, pp. 13-14 (La. App. 4 Cir. 6/29/01), 796 So.2d 649, 659-60.
Conclusion
Accordingly, I respectfully dissent from the majority’s reversal of the convictions of Lionel and William Serigne. I would affirm the trial court’s convictions of both defendants.

. It was not until this court ordered the parties to file additional briefs on the issue of whether Lionel's waiver of the jury constituted an error patent that the appellants addressed this issue.

. The amendment hybridizing the statute followed the 1995 amendment whereby the legislature once again made the death penalty, which had been removed from the statute in 1977, available as an optional sentence for certain types of aggravated rape, including the rape of a child. See La. Acts 1995, No. 397, § 1; La. Acts 1997, No. 898, § 1.

. La. R.S. 14:42 was again amended by La. Acts 2015, No, 184, § -1; and Acts'2015, No. 256, § 1, effective August 1, 2015, to provide for “First degree rape," which carries the option of the death penalty if the district attorney chooses to pursue capital punishment, and “Second degree rape,” in La. R.S. 14:42,1, which does not include the option of capital punishment. That amendment is not pertinent to this case. -

. 1977 La. Acts. No. 343, effective September 9,-1977.-

. Although the Singleton court held the defendant was legally entitled to waive a jury trial, it remanded the matter for an evidentiary hearing on whether Mr. Singleton’s waiver was knowing and voluntary under the circumstances of that case, 2005-0622, p. 12, 922 So.2d at 654.

. The Hypolite court also noted that the Louisiana Supreme Court's decision in State v. Goodley, supra, was not controlling, 2013-1365, p. 15, 439 So.3d at 698.

. A trial court’s ruling on ground 1, that the verdict is contrary to the law and evidence, is not reviewable on appeal. State v. Snyder, 98-1078, p. 37, n. 21 (La.4/14/99), 750 So.2d 832, 8591; State v. Colbert, 2007-0947, p. 14-15 (La.App. 4 Cir. 7/23/08), 990 So.2d 76, 85-86.

. At trial the birthdates of the two defendants and their three accusers were stipulated to: William Serigne, March 28, 1966; Lionel Se-rigne, February 13, 1959; D.A., December 27, 1970; M.S., October 19, 1987; and B.M., July 25, 1996.

. The defense witnesses also included the detective who had originally investigated the victims’ allegations, and thirteen of the defendants' relatives and friends, each of whom offered factual and/or character evidence as to one or both of the defendants.

. She testified she told a friend several months afterward about William’s abuse of her, and that the friend had since died,

, At this time J.B., William and'their children were living on Sylvia Blvd, near D.A., her then husband, B.A, and-their, children. J.B.- and William subsequently divorced, as did D.A. and B.A.

. This statement was introduced into evidence.

. These photographs had been identified by D.A.’s mother and introduced into evidence.

, On cross-examination M.S. conceded that she would have been fourteen in 2001, when the family moved to Sylvia Blvd,

. A series of cases have developed the so-called "antagonistic defenses” test which, if and when satisfied, would require a severance. To meet the test, a defendant must show that a joint trial would be prejudicial to his interests. State v. Williams, 416 So.2d 914, 916 (La.1982).